**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BURGERFI INTERNATIONAL, INC., *et al.*,[1] | Case No. 24-12017 (CTG) |
| Debtors. | (Jointly Administered) |
| | <u>**Hearing Date**</u>: *(Requested)*<br>**October 7, 2024 at 3:00 p.m. (ET)** |
| | <u>**Objection Deadline**</u>: *(Requested)*<br>**September 30, 2024** |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING
BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS (B)
AUTHORIZING THE DEBTORS TO DESIGNATE A STALKING HORSE BID, (C)
SCHEDULING AN AUCTION AND APPROVING THE FORM AND
MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION AND
ASSIGNMENT PROCEDURES, AND (E) SCHEDULING A SALE HEARING
AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF;
(II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR
OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND (B) APPROVING
THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
<u>AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF</u>**

The debtors and debtors in possession in the above-captioned bankruptcy cases (collectively, the "**Debtors**") hereby move for an order establishing procedures for the sale of the Debtors' assets, and for an order approving such sale, as more fully set forth below. In support of this motion (the "**Sale Motion**"), the Debtors rely on the *Declaration of Jeremy Rosenthal in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 21] (the "**First Day Declaration**"),[2] and respectfully represent as follows:

---

[1] The last four digits of the tax identification number of BurgerFi International, Inc. and of Anthony's Pizza Holding Company, LLC are 8815 and 4718, respectively. A list of all Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, is available at https://cases.stretto.com/BFI. The Debtors' mailing address is 200 E Las Olas Blvd., Suite 1400, Fort Lauderdale, FL 33301.

[2] Capitalized terms used but not defined herein have the meanings ascribed in the First Day Declaration or in the DIP Order (as defined herein).

## PRELIMINARY STATEMENT

1.      The Debtors commenced these bankruptcy cases on September 11, 2024 (the "**Petition Date**"), to implement a value-maximizing transaction through a sale or sales of their assets as a going concern.  By this Sale Motion, the Debtors seek approval of sales to close by October 31, 2024, and related bidding and noticing procedures.  This timeline balances the goals of a robust marketing process to secure the highest or otherwise best value for the estates and of minimizing the business disruption and costs of an extended bankruptcy process.

2.      As more fully described in the supporting declaration, the Debtors engaged in a prepetition marketing process through the Debtors' investment banker, Kroll Securities, LLC ("**Kroll**") beginning in June 2024 that included contact with more than 130 potential buyers.  Now that buyers may avail themselves of the protections of 11 U.S.C. § 363, the Debtors anticipate additional interest in and better values for their assets.  The Debtors submit that a longer sale process cannot be funded; that the sale process will not benefit from additional time; and that the timeline proposed herein will deliver a fair and robust sale process.

3.      The Debtors anticipate selling substantially all of their assets (the "**Assets**") in two sales: one for the Anthony's Coal Fired Pizza ("**Anthony's**") business as a going concern, and the other for the BurgerFi business as a going concern.  However, the proposed Bid Procedures (as defined below) will facilitate a robust postpetition marketing effort to obtain the highest or otherwise best offer, or combination of offers, for the Assets, whether such offer or offers is for Anthony's, BurgerFi, or some other configuration of assets. As set forth in further detail below, the Bid Procedures and the related relief requested in this Sale Motion are in the best interests of the Debtors' estates and their stakeholders.  Accordingly, the Debtors respectfully request that the Court grant this Sale Motion.

**RELIEF REQUESTED**

4.     The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "**Bid Procedures Order**"):

    a.     authorizing and approving bid procedures in substantially the form attached as Exhibit 1 to the Bid Procedures Order (the "**Bid Procedures**");

    b.     authorizing, but not directing, the Debtors to enter into one or more "stalking horse" agreements (each, a "**Stalking Horse Agreement**"), which may include bid protections for parties other than the Senior Lender, with one or more bidders (the "**Stalking Horse Bidders**") for the purpose of establishing a minimum acceptable bid for the Assets of the Anthony's business or for the Assets of the BurgerFi business (each, a "**Stalking Horse Bid**");

    c.     approving the form and manner of notice of the sale hearing, attached as Exhibit 2 to the Bid Procedures Order (the "**Sale Notice**");

    d.     scheduling the auction (the "**Auction**"), to be held solely to the extent that the Debtors receive competing qualified bids, and the Sale Hearing (as defined below);

    e.     approving procedures (the "**Assumption and Assignment Procedures**") for the assumption and assignment of certain executory contracts and leases (the "**Assigned Contracts**"), as well as a draft notice to each relevant non-debtor counterparty to a potential Assigned Contract containing (i) the Debtors' calculation of the amount necessary to cure any defaults required to be cured under section 365 of the Bankruptcy Code under an applicable potential Assigned Contract; and (ii) certain other information regarding the potential assumption and assignment of potential Assigned Contracts in connection with the Sale (the "**Assumption and Assignment Notice**"), attached as **Exhibit 3** to the Bid Procedures Order; and

    f.     granting related relief.

5.     Second, upon conclusion of the Sale Hearing, the Debtors request entry of an order,

substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**"):  (a) authorizing and

approving the sale of the Assets to the Successful Bidder free and clear of Encumbrances, with

such Encumbrances to attach to the proceeds of such sale; (b) authorizing the assumption and

assignment of certain contracts and leases to be assumed and assigned in connection with the proposed sale of the Assets to the Successful Bidder; and (c) granting related relief.

## JURISDICTION AND VENUE

6.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors consent to the entry of a final order on this Sale Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006(a), 9007, and 9008, and Local Rules 2002-1 and 6004-1.

## BACKGROUND

### I.    THE CHAPTER 11 CASES

9.      On September 11, 2024 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee of unsecured creditors has been appointed in these chapter 11 cases.

10.     The Debtors develop, operate, and franchise restaurants under the BurgerFi and Anthony's Coal Fired Pizza brands. BurgerFi provides a fast-casual, "better burger" experience using all-natural, high-quality ingredients in modern, eco-friendly restaurants, while Anthony's provides a premium-casual pizza and wing restaurant centered around a 900-degree coal-fired

oven and fresh, never frozen, high-quality ingredients.  As of the date hereof, the Debtors operate 67 restaurants, franchise another 77 restaurants, and employ more than 2,100 persons.

11.     Prior to the Petition Date, the Debtors retained Kroll to run a robust sales process which involved contacting 139 potential buyers (57 strategic and 82 financial) beginning on June 17, 2024.  Of those potential buyers, 62 parties (13 strategic and 49 financial) received the CIM. Nine indications of interest were received during the week of July 22, 2024, with proposals to acquire Anthony's and BurgerFi as standalone businesses as well as on a consolidated basis. Kroll and the management team conducted numerous management meetings and provided access to an electronic data room. The parties that submitted indications of interest were then invited to submit letters of intent, and two third parties did so, with one letter of intent for the BurgerFi business and the other for the Anthony's business.  The Debtors determined to commence these cases and pursue going concern sales under section 363 of the Bankruptcy Code.

12.     Additional information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these chapter 11 cases is set forth in detail in the First Day Declaration and incorporated herein by reference.

13.     Since the Petition Date, the Debtors have obtained postpetition financing from TREW Capital Management Private Credit 2 LLC ("**TREW**"), their prepetition senior secured lender.  This financing (the "**DIP Loans**") has been approved on an interim basis by order entered on September 16, 2024 [Docket No. 65] (the "**DIP Order**"), and a final hearing thereon has been scheduled for October 7, 2024.  The terms of the DIP Loans require certain milestones for these cases and the sale process, including among other things that the sales of the Assets close on or before October 31, 2024.  *See* DIP Credit Agreement § 6.16.  TREW has agreed to certain modifications to such milestones as set forth herein.

## II.    THE PROPOSED SCHEDULE

14.    The Debtors propose to solicit bids and effect a sale transaction on the following schedule, consistent with the requirements of the DIP Credit Agreement and pursuant to the Bid Procedures, all subject to Court approval and availability:

| Event | On or Before Date |
| --- | --- |
| Hearing to Consider Approval of Bid Procedures | October 7, 2024 |
| Deadline for entry of the Bid Procedures Order | October 8, 2024 |
| Deadline for the Debtors to file and serve the Sale Notice | October 9, 2024 |
| Deadline for the Debtors to file the Assumption and Assignment Notice | October 9, 2024 |
| Deadline for Designating any Stalking Horse Bid | October  11, 2024 |
| Deadline for Sale Objections and Cure Objections | October 17, 2024 |
| Bid Deadline | October 18, 2024 at 5:00 p.m. (ET) |
| Deadline to Qualify Bidders and Notify Them | October 19, 2024 |
| Deadline for Service of Adequate Assurance Packages (Mail, Email) | October 20, 2024 |
| Deadline to hold Auction | October 21, 2024 |
| Filing of Notice of Auction Results | October 22, 2024 |
| Deadline for Post-Auction Objections (for adequate assurance or other issues related to the identity of the Successful Bidder, or issues related  to the conduct of the Auction) | October 24, 2024 at 10:00 a.m. (ET) |
| Sale Hearing | October 25, 2024 at 10:00 a.m. (ET) |
| Deadline for Entry of Sale Order | October 28, 2024 |
| Closing | October 31, 2024 |

15.     The Debtors believe that this timeline, particularly when considering the Debtors'

significant prepetition marketing efforts, is feasible and constitutes a thorough marketing process

for the assets, provides interested parties with sufficient opportunity to participate in the sale

process, and preserves going concern value.  In addition to the Debtors' marketing efforts to date,

the Debtors will utilize the time prior to entry of the Bid Procedures Order to actively market the

assets and facilitate the submission of bids by the Bid Deadline.  Failure to adhere to the timeline

reflected above will constitute a default under the DIP Credit Agreement.  Ultimately, the Debtors,

in the exercise of their reasonable business judgment, have determined that the proposed schedule

will result in the highest and best bid for the Assets under the circumstances.

## III.    THE BID PROCEDURES

16.     To expeditiously solicit, receive, and evaluate bids in a fair and accessible manner,

the Debtors have developed and proposed the Bid Procedures (a copy of which is attached as

Exhibit 1 to the Bid Procedures Order).[3] The proposed Bid Procedures are designed to create a

fair, efficient, competitive, and value-maximizing sale process for the Debtors' Assets consistent

with the Milestones and the timeline of these cases.

17.     The Bid Procedures will provide potential bidders with sufficient notice and time

to conduct due diligence with respect to the Debtors' assets and to submit binding bids in advance

of the auction and the Sale Hearing.  The Debtors and their advisors have already commenced a

marketing and sale process to solicit buyers and to establish the market value of the Assets, a

process that began prepetition.  In creating the Bid Procedures, the Debtors are balancing the need

---

[3]    This summary is qualified in its entirety by the Bid Procedures attached as Exhibit 1 to the Bid
Procedures Order. All capitalized terms that are used in this summary but not otherwise defined herein
shall have the meanings given to such terms in the Bid Procedures. To the extent there are any conflicts
between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

to consummate the sale of their Assets on a timeline that can be funded and meets the DIP Loan milestones with their need to attract the highest or otherwise best offer reasonably achievable for their assets.

18.     The Bid Procedures are designed to encourage all prospective bidders to put their best bid forward, bring finality to the Debtors' sale process, and create a path towards entry of a Sale Order and approval of the Bid (or Bids) delivering the highest or otherwise best available recoveries to the Debtors' stakeholders.  While the Debtors anticipate selling substantially all of the Assets in two sales – one for the Anthony's assets and restaurants as a going concern, and the other for the BurgerFi assets and restaurants as a going concern – the Debtors invite, and the Bid Procedures provide for, bids for the Assets in any number of lots and transactions.

19.     The Debtors request that the Bid Procedures Order establish the following dates and deadlines, subject to extension and other modifications by the Debtors as consistent with the Bid Procedures:

a.      **Bid Deadline**:  October 18, 2024 at 5:00 p.m. (ET) as the deadline by which all Qualified Bids for the Assets must be actually received pursuant to the Bid Procedures (the "**Bid Deadline**");

b.      **Auction**:  October 21, 2024 at 10:00 a.m. (ET) as the date and time of the Auction, if necessary, which will be held at the offices of Raines Feldman Littrell LLP, 1350 Avenue of the Americas, 22nd Floor, New York, NY 10019, or at such other time and place as the Debtors will timely notify all Qualified Bidders.

c.      **Sale Hearing**:  October 25, 2024 at 10:00 a.m. (ET)  (the "**Sale Hearing**"), with a deadline for entry of the Sale Order on or before October 28, 2024.

20.     The following summarizes the material points of the Bid Procedures:[4]

| Material Terms of the Bid Procedures | |
| --- | --- |
| **Provisions Governing Qualification of Bidders and Qualified Bids**<br><br>Local Rule 6004-1(c)(i)(A)-(B) | To receive due diligence information and to receive additional nonpublic information regarding the Debtors, a potential bidder must deliver to the Debtors, which will be shared with the Consultation Parties (as defined below), the following:<br><br>a.  executed confidentiality agreement in form and substance satisfactory to the Debtors and containing terms no more favorable to the Prospective Bidder than those contained in any confidentiality agreement executed by any Stalking Horse Bidder (unless such party is already a party to an existing confidentiality agreement with the Debtors that is acceptable to the Debtors for this due diligence process, in which case such agreement shall govern) regarding:  (i) the nondisclosure of confidential information, (ii) prohibitions on contacting third parties in connection with a Sale Transaction, (iii) covenants to not solicit employees of the Debtors, (iv) prohibitions on purchasing or otherwise acquiring the Debtors' debt and equity securities, and (v) the survival of certain provisions of the Confidentiality Agreement; and<br><br>b.  sufficient information to allow the Debtors to determine that the Prospective Bidder seeks to access the Data Room for a bona fide purpose consistent with the Bid Procedures and has the financial and managerial wherewithal to submit a Qualified Bid and to consummate the Sale Transaction contemplated thereby.<br><br>Any bid (a "Qualified Bid") by a qualified bidder (a "Qualified Bidder") must be submitted in writing by the Bid Deadline and satisfy the following requirements, in each case, to the satisfaction of the Debtors in consultation with the Consultation Parties:<br><br>(A)     Identification of Bidder. A Qualified Bid must fully disclose the following:<br>(1) the legal identity of each person or entity bidding for the applicable Assets and/or otherwise sponsoring, financing (including through the issuance of debt or the secondary purchase of assets in connection with such Bid), or participating in (including through |

---

[4]   The following summary is provided for convenience purposes only. To the extent any of the terms described below are inconsistent with the Bid Procedures, the Bid Procedures control in all respects. Capitalized terms used in this summary but not defined herein shall have the meanings ascribed to them in the Bid Procedures.

| **Material Terms of the Bid Procedures** |
| --- |

|  | license or similar arrangement with respect to the Assets to be acquired in connection with such Bid) the proposed acquisition of Assets or the Auction in connection with such Bid and the complete terms of any such participation; and<br><br>(2) any past or present connections or agreements with the Debtors, TREW, L Catterton, any other known Prospective Bidder or Qualified Bidder, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtors or their non-Debtor affiliates).<br><br>(B) <u>Purchased Assets</u>. A Qualified Bid must identify the following:<br>(1) the Assets to be purchased, including any then-known executory contracts and unexpired leases such Prospective Bidder wishes to bid on (the Assigned Contracts); and<br>(2) the liabilities, including applicable cure costs, if any, to be assumed by the Prospective Bidder in the Sale Transaction, including any debt to be assumed.<br><br>(C) <u>Consideration</u>.<br><br>(1) <u>Credit Bidding</u>. TREW (or its designee) may in its sole and absolute discretion, be a Qualified Bidder and may credit bid its claims on collateral in which it holds a perfected security interest (a "Credit Bid") on Assets at the Auction, subject to and in accordance with Section 363(k) of the Bankruptcy Code. TREW shall not be prohibited from making such Credit Bid "for cause" under Section 363(k) of the Bankruptcy Code. For the avoidance of doubt, TREW will be deemed to be a Qualified Bidder, for all purposes and requirements pursuant to the Bid Procedures, notwithstanding the requirements that a Prospective Bidder must otherwise satisfy to be a Qualified Bidder, and any Bid submitted by TREW will be deemed to be a Qualified Bid, for all purposes and requirements pursuant to the Bid Procedures, notwithstanding the requirements that a Bid must otherwise satisfy to be a Qualified Bid.<br><br>(2) <u>Form of Consideration</u>. Except as set forth above with respect to TREW (and as provided in the Bid Procedures with respect to landlords bidding on leases to which they are counterparties), a Qualified Bid must propose a purchase price payable in cash and specified assumed liabilities. Bids proposing a purchase price other than in cash shall not be Qualified Bids. |

| **Material Terms of the Bid Procedures** |
| --- |

(3) <u>Purchase Price</u>. Each Bid must clearly set forth the purchase price to be paid for the Assets (the "**Purchase Price**") and (i) indicate the source of cash consideration, including funding commitments, and confirm that such consideration is not subject to any contingencies, (ii) identify separately the non-cash components of the Purchase Price, which non-cash components shall be limited to the Credit Bid (with respect to TREW) and any assumed liabilities, and (iii) allocate the Purchase Price amongst the purchased Assets.  For the avoidance of doubt, a Qualified Bid must at a minimum allocate the Purchase Price to (i) the leases proposed to be assumed and assigned, and (ii) any furniture, fixtures, or equipment proposed to be purchased; and provided that any such allocation shall not prejudice the rights of any party in interest to contest that allocation.  Without limiting the foregoing, each Bid must include the payment of all allowed cure amounts and all other amounts required to effect the assumption and assignment of any applicable executory contracts and unexpired leases pursuant to § 365.  The Debtors will consider Bids for all or any part of the Assets (each such bid, a "**Partial Bid**") if the Debtors receive one or more Partial Bids for the Assets such that, when taken together, and after considering the risks associated with consummating several individual Bids, the Partial Bids collectively constitute a higher or otherwise better bid as compared to the highest and best bid for all or substantially all of the Assets.

(D) <u>Proposed Asset Purchase Agreement and Sale Order</u>:  The Debtors will provide forms of the asset purchase agreement and sale order to be used by bidders, provided that the Debtors reserve the right to modify such forms in their business judgment and after consultation with the Consultation Parties, including but not limited to in the event of any stalking horse bid (the "**Form Asset Purchase Agreement**"). A Qualified Bid must be accompanied by a proposed asset purchase agreement—including any required transition services or management agreement as well as all exhibits and schedules—which shall (a) be duly authorized and executed, (b) be similar in form and substance to, and marked against the Form Asset Purchase Agreement, including, without limitation, any changes to any exhibits or schedules thereto (c) specify the proposed Purchase Price for the applicable Assets, and (d) identify any then-known Assigned Contracts that may be proposed for assumption and assignment in connection with the proposed Sale Transaction (with all related cure amounts to be

| **Material Terms of the Bid Procedures** |
| --- |

satisfied by the bidder). A Qualified Bid must also contain a proposed Sale Order based on, and marked against, the form of Sale Order provided by the Debtors. For the avoidance of doubt, the Debtors may, upon consultation with the Consultation Parties, disqualify a Bid if the marked agreement materially alters any Form Asset Purchase Agreement.

(E) <u>Financial Information</u>. A Qualified Bid must include the following:
(1) a representation that the Prospective Bidder is financially capable of timely consummating the Sale Transaction contemplated by the Prospective Bidder's proposed asset purchase agreement;
(2) sufficient evidence, as reasonably determined by the Debtors (in consultation with the Consultation Parties), to determine that the Prospective Bidder has, or can obtain, the financial wherewithal to timely consummate the Sale Transaction contemplated by the Prospective Bidder's proposed asset purchase agreement; and
(3) Adequate Assurance Information (as defined herein) with respect to any Assigned Contracts included or that may be included in the Prospective Bidder's Bid.

(F) <u>Good Faith Deposit</u>. Each Qualified Bid must be accompanied by a good faith deposit (each, a "**Good Faith Deposit**") in the form of cash (or other form acceptable to the Debtors (in consultation with the Consultation Parties) in an amount equal to ten percent (10%) of the proposed purchase price for the applicable Assets; provided, that no Good Faith Deposit shall be required from TREW.

Good Faith Deposits shall be deposited into a trust account maintained on behalf of the Debtors (and to be designated by Debtors) and handled in accordance with the Bid Procedures. To the extent a Qualified Bidder increases the purchase price before, during, or after the Auction, the Debtors (in consultation with the Consultation Parties) reserve the right to require that such Qualified Bidder adjust its Good Faith Deposit so that it equals ten percent (10%) of the increased purchase price. The Debtors reserve the right to increase or decrease the Good Faith Deposit for one or more Qualified Bidders (in consultation with the Consultation Parties) except with respect to TREW if it is the Stalking Horse Bidder.

(G) Adequate Assurance. A Qualified Bid must include evidence (the "**Adequate Assurance Information**") of the Prospective Bidder's (or any other relevant assignee's) ability to comply with Section 365 of the Bankruptcy Code (to the extent applicable), including providing

| **Material Terms of the Bid Procedures** |
|---|

|  | adequate assurance of such Prospective Bidder's (or any other relevant assignee's) ability to cure any defaults existing under or perform future obligations arising under any Assigned Contracts that are included or that may be included in the Bid. The Adequate Assurance Information may include: (i) a corporate organizational chart or similar disclosure identifying corporate ownership and control; (ii) financial statements; (iii) tax returns (iv) annual reports; and (v) summaries of the proposed assignee's experience in the industry, including the number of restaurants currently operating and all trade names used.<br><br>The Adequate Assurance Information must be sufficient, as reasonably determined by the Debtors (in consultation with the Consultation Parties), and the Debtors (in consultation with the Consultation Parties) may require any of the foregoing information, or additional information, to be included in any Adequate Assurance Information. All Adequate Assurance Information must be in a form that will permit its immediate dissemination to the applicable counterparties. The Debtors will promptly transmit copies of Adequate Assurance Information to the applicable counterparties.<br><br>(H) <u>Representations and Warranties</u>. A Qualified Bid must include the following representations and warranties:<br><br>(1) a statement that the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the applicable Assets prior to submitting its Bid;<br><br>(2) a statement that the Prospective Bidder has relied solely upon its own independent review, investigation and/or inspection of any relevant documents and the Assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the applicable Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Form Asset Purchase Agreement;<br><br>(3) a statement that all proof of financial ability to consummate the applicable Sale Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and |

| **Material Terms of the Bid Procedures** |
| --- |

(4) a statement that the Prospective Bidder agrees to be bound by the terms of the Bid Procedures.

(I) <u>Authorization</u>. A Qualified Bid must (1) include evidence of authorization and approval from the Prospective Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of any bid for the Assets, participation in the Auction, and closing of the Sale Transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement; or (2) if the Prospective Bidder is an entity formed for the purpose of effecting the proposed Sale Transaction, a Qualified Bid must provide written evidence acceptable to the Debtors of authorization and the approval by the equity holder(s), as applicable, of such Prospective Bidder.

(J)  <u>Joint Bids</u>.  The Debtors (in consultation with the Consultation Parties) will be authorized to approve joint Bids in their discretion on a case-by-case basis.

(K) <u>Disclosures</u>. A Qualified Bid must identify with particularity each and every condition to closing and all executory contracts and unexpired leases to be assumed and assigned and must include a commitment to close by no later than October 31, 2024.

(L) <u>Other Requirements</u>. A Qualified Bid must:

(1) state that the Prospective Bidder agrees to serve as a backup bidder (a "**Backup Bidder**") if such bidder's Qualified Bid is selected at the Auction as the next highest or next best bid after the Successful Bid (as defined herein) for the applicable Assets (each such bid, a "**Backup Bid**");

(2) state that the Bid, as may be modified before or during the Auction, represents a binding, irrevocable, good-faith and bona fide offer to purchase the applicable Assets and is not subject to or conditioned on any due diligence, financing, or other contingency (other than the conditions to closing under the applicable agreement), and is irrevocable until the later of (i) the applicable outside date for consummation of the applicable Sale Transaction or (ii) the Backup Bid Expiration Date (as defined herein);

| Material Terms of the Bid Procedures |
| --- |

(3)  expressly state and acknowledge that the Prospective Bidder shall not be entitled to a Breakup fee, termination fee, expense reimbursement or other "bidding protection" in connection with the submission of a bid for the Assets or otherwise participating in the Auction or the Sale Transaction process, unless otherwise granted by the Debtors (in consultation with the Consultation Parties) and approved by an order of the Court;

(4)  state that the Prospective Bidder is committed to closing the Sale Transaction contemplated in its Bid as soon as practicable and in any case no later than October 31, 2024;

(5)  specify (i) whether the Qualified Bidder intends to hire any of the Debtors' employees and (ii) the proposed treatment of the Debtors' prepetition compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including offer letters, employment agreements, consulting agreements, retiree benefits, and any other employment related agreements (collectively, the "**Employee Obligations**");

(6)  expressly waive any claim or right to assert any substantial contribution administrative expense claim under Section 503(b) of the Bankruptcy Code or the payment of any broker fees or costs in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the Sale Transaction process;

(7)  include a covenant to cooperate with the Debtors (i) to provide pertinent factual information regarding the Prospective Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and any other applicable regulatory requirements and (ii) to obtain Court approval of the Sale Transaction;

(8)  state or otherwise estimate the types of transition services, if any, the Prospective Bidder would require of and/or provide to the Debtors, including an estimate of the time any such transition services would be required of and/or provided to the Debtors, if the Prospective Bidder's Bid were selected as the Successful Bid for the applicable Assets;

(9)  certify that the Prospective Bidder did not collude with any other bidders and is not otherwise a partnership, joint venture, or other entity in which more than one bidder (or any affiliates of a bidder)

| **Material Terms of the Bid Procedures** |
|---|

| | has a direct or indirect interest, unless consented to in writing by the Debtors (in consultation with the Consultation Parties); |
|---|---|
| | (10) include a covenant to comply with the terms of these Bid Procedures and the Bid Procedures Order; |
| | (11) include contact information for the specific person(s) the Debtors should contact in the event they have any questions about the Bid of the Prospective Bidder; and |
| | (12) confirm that the Bid is not conditioned on any contingency, including, among other things, corporate or regulatory approvals or the outcome or completion of due diligence. |
| **Modification of Bid and Auction Procedures**<br><br>Local Rule 6004-1(c)(i)(D) | The Debtors (in consultation with the Consultation Parties ) reserve the right to, in their business judgment, in a manner consistent with their fiduciary duties and applicable law, modify the Bid Procedures, including to, among other things, (a) extend or waive deadlines or other terms and conditions set forth herein, (b) adopt new rules and procedures for conducting the bidding and Auction process, (c) if applicable, provide reasonable accommodations to a Qualified Bidder, or (d) otherwise modify the Bid Procedures to further promote competitive bidding for and maximizing the of value of the Assets; provided, that such extensions, waivers, new rules and procedures, accommodations and modifications (i) do not conflict with and are not inconsistent with the Bid Procedures Order, the Bid Procedures, the Bankruptcy Code, the DIP Agreement, the DIP Order, or any other order of the Court and (ii) are promptly communicated to each Qualified Bidder. |
| **Closing with Alternative Back-Up Bidders**<br><br>Local Rule 6004-1(c)(i)(E) | Prior to the conclusion of the Auction, the Debtors shall determine which Qualified Bid is the next highest or otherwise best Qualified Bid after the Successful Bid for the applicable assets (each, a "**Backup Bid")** and notify all Qualified Bidders bidding for the applicable Assets of the identity of the relevant Backup Bidder(s) and the amount of the Purchase Price and other material terms of its Backup Bid.  Each Backup Bidder shall wire to the Debtors, in immediately available funds, the Incremental Deposit Amount based on the Purchase Price of its Backup Bid, not later than one (1) business day following the date on which the applicable Backup Bid is announced.  The Backup Bid(s) shall remain binding on the Backup Bidder(s) until the closing of the Sale for the applicable Assets.  If the Successful Bidder(s) for the applicable Assets fail to |

| **Material Terms of the Bid Procedures** |  |
|---|---|
|  | consummate the Sale(s), the Backup Bidder(s) shall be deemed the new Successful Bidder(s) for the applicable Assets, and the Debtors shall be authorized, but not required, to consummate the Sale(s) of the applicable Assets to the Backup Bidders. |
| **Provisions Governing the Auction**<br><br>Local Rule 6004-1(c)(ii) | The Auction shall be governed by the following procedures, subject to the Debtors' right (in consultation with the Consultation Parties) to modify such procedures in their business judgment, subject to and in accordance with these Bid Procedures:<br><br>A. Baseline Bids. Prior to the commencement of the Auction, the Debtors (in consultation with the Consultation Parties ) will determine, in their business judgment, the highest and/or best Qualified Bid (each such Qualified Bid, a "**Baseline Bid**"). Bidding at the Auction shall commence at the amount of the Baseline Bid.<br><br>B. Sub-Auctions. The Debtors (in consultation with the Consultation Parties) reserve the right to host Sub-Auctions for Assets at their discretion (each such package an "**Auction Package**").<br><br>C. Minimum Overbid. Any overbid to the initial Baseline Bid at the start of the Auction, and each subsequent bid, shall be in increments of no less than $250,000.00.  Bidding at the Auction will begin with the Baseline Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid (a "**Subsequent Bid**") is submitted by a Qualified Bidder that (i) improves on such Qualified Bidder's immediately prior Qualified Bid and (ii) the Debtors determine is (A) for the first round, a higher or otherwise better offer than the Baseline Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined herein).<br><br>The Debtors may (in consultation with the Consultation Parties) modify the initial $250,000.00 bidding increment at any point in the Auction by announcing such change to the Qualified Bidders (each, such Bid, a "**Minimum Overbid**").<br><br>Upon a Qualified Bidder's declaration of a Bid at the Auction, the Qualified Bidder (other than TREW) must state on the record its commitment to pay within 1 business day following the Auction, if such Bid were to be selected as the Successful Bid or as the Backup Bid, the incremental amount of the Qualified Bidder's Good Faith Deposit calculated based on the increased purchase price of such Bid |

| **Material Terms of the Bid Procedures** |
|---|

|  | (such Good Faith Deposit so increased, the "**Incremental Deposit Amount**") if applicable. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by any Bid subsequent to a Baseline Bid, the Debtors will, at each round of bidding, consider and/or give effect to (a) any additional liabilities to be assumed by a Qualified Bidder under the Bid, including whether such liabilities are secured or unsecured, (b) any additional costs that may be imposed on the Debtors, and (c) the provision of any Wind-Down Expenses, treatment of the DIP Obligations, and any additional outstanding debt, as applicable.<br><br>D.  Leading Bid. After the first round of bidding and between each subsequent round of bidding, the Debtors will announce the bid that they (in consultation with the Consultation Parties) believe to be the highest or otherwise best offer (each such bid, a "**Leading Bid**") and describe the material terms thereof. Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the material terms of the Leading Bid, subject to the Debtors' authority to revise the Auction procedures to the extent permitted hereby.<br><br>The Auction or any Sub-Auction will be conducted by open bidding in the presence of all other Qualified Bidders and each Qualified Bidder shall have the right to be present for all rounds of open bidding and to submit additional Bids and make modifications to its proposed asset purchase agreement at the Auction to improve its Bid. The Debtors may, in their business judgment, engage in discussions and negotiate with any and all Qualified Bidders participating in the Auction or Sub-Auction outside the presence of other bidders before each round of bidding, including to improve or clarify the terms of bids made.<br><br>The Debtors shall have the right to determine (in consultation with the Consultation Parties) which Bid is the highest or otherwise best Bid and, in accordance with the terms of these Bid Procedures, reject, at any time, without liability, any bid that the Debtors deem to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, these Bid Procedures, any order of the Court, or the best interests of the Debtors and their estates, including, without limitation, the provision of any Wind-Down Expenses, treatment of the DIP Obligations, and any additional outstanding debt, as applicable. |

| **Material Terms of the Bid Procedures** |
| --- |

The determination of which Qualified Bid(s) constitutes the Baseline Bid(s) and which Qualified Bid(s) constitutes the Successful Bid(s) shall take into account any factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid(s) to the Debtors' estates, which may include, among other things: (a) the type and amount of Assets sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Baseline Bid; (e) the tax consequences of such Qualified Bid; (f) the assumption of obligations, including contracts and leases; (g) the cure amounts to be paid; and (h) the impact on employees, including the number of employees proposed to be transferred and employee-related obligations to be assumed (collectively, the "**Bid Assessment Criteria**").

E.   Conclusion of Each Overbid Round. Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, and upon consultation with the Consultation Parties, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Debtors.

F.   No Round-Skipping. Round-skipping, as described herein, is explicitly prohibited. To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for the Assets.

G.   Announcing Highest Bid.   With respect to the Auction, the Debtors shall, subsequent to each Overbid Round Deadline, announce whether the Debtors, in consultation with the Consultation Parties, have identified (a) in the initial Overbid round, an Overbid as being higher or otherwise better than the Baseline Bid in respect of the Assets that are the subject of the Auction or (b) in subsequent rounds, an Overbid as being higher or otherwise better than the Overbid

| **Material Terms of the Bid Procedures** |
|---|

|  | previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "**Prevailing Highest Bid**"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated as the Prevailing Highest Bid as well as the value attributable to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.<br><br>H.  Closing the Auction.  The Auction shall continue until there is only one Qualified Bid that the Debtors and the Consultation Parties determine, to be the highest or otherwise best Qualified Bid for the Assets. Such Qualified Bid shall be declared the "**Successful Bid**," and such Qualified Bidder, the "**Successful Bidder**," with the next best bid and bidder being declared the Backup Bid and Backup Bidder, respectively, at which point the Auction will be closed. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance of such Successful Bid is conditioned upon approval by the Court of such Successful Bid. For the avoidance of doubt, nothing in these Bid Procedures shall prevent the Debtors from exercising their fiduciary duties under applicable law. As soon as reasonably practicable after closing the Auction, the Debtors shall finalize definitive documentation to implement the terms of the Successful Bid and Backup Bid, and, as applicable, cause such definitive documentation to be filed with the Court. |
| **Privacy Ombudsman**<br><br>Local Rule 6004-1(b)(iii) | The Debtors expect that the Stalking Horse Purchaser or another Successful Bidder will agree that any personally identifiable information will be transferred subject to the Debtors' current privacy policy.  If the Stalking Horse Purchaser or another Successful Bidder seeks a transfer of such property in a manner that is contrary to such policy or otherwise requires the appointment of a consumer privacy ombudsman, the Debtors will seek such relief expeditiously, if necessary to comply with applicable law. |

21.     TREW shall be deemed to be a Qualified Bidder.  TREW (or its designee) may credit bid pursuant to and subject to 11 U.S.C. § 363(k) without any deposit with the Debtors.

TREW (or its designee) has the unqualified right at any time to credit bid on a dollar-for-dollar basis its Prepetition Obligations, the DIP Obligations, and the DIP Superpriority Claims, if any (as each term is defined in the DIP Order) in accordance with the DIP Order ("**Credit Bid**").

22.     Importantly, the Bid Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all Qualified Bid proposals and, as noted, preserve the Debtors' right to modify the Bid Procedures (in consultation with the Consultation Parties) as necessary or appropriate to maximize value for the Debtors' estates.

## IV.   THE STALKING HORSE BIDDERS AND PROTECTIONS

23.     The Debtors have determined, in their reasonable business judgment, that proceeding with the sale process as requested herein without first entering into a "stalking horse" agreement is warranted.  The Debtors intend to pursue discussions with potential purchasers and seek the right to enter into a stalking horse agreement if the Debtors believe that such an agreement will further the purposes of the Auction, by among other things, enticing value-maximizing bids.

24.     The Debtors are in negotiations with TREW to submit a stalking horse bid for the Assets relating to the BurgerFi business and a stalking horse bid for the Assets relating to the Anthony's business.  Any such stalking horse bid will be without associated bid protections.  In the event that the Debtors obtain such stalking horse bids from TREW, the Debtors will promptly file such bids on the docket and otherwise notify prospective bidders.

25.     In the event that TREW does not submit a stalking horse bid, or has submitted a stalking horse bid but the Debtors subsequently determine (in consultation with the Consultation Parties) in advance of the bidding deadline to designate a higher or otherwise better bid from a third party as a stalking horse, the Debtors request authority, in the exercise of their sound business

judgment and in consultation with any official committee appointed in this case, to provide a breakup fee in an amount not to exceed 2% of the total guaranteed cash or cash-equivalent price plus reimbursement of actual, reasonable and documented direct expenses up to $200,000 (together, the "**Breakup Fee**") to a Qualified Bidder who is not an existing insider or lender and who provides a Qualified Bid, for substantially all assets of the BurgerFi restaurants or of the Anthony's restaurants on a going-concern basis, that will serve as the "stalking horse" bid for such Assets at the Auction.  For purposes of clarity, the Debtors do not seek to offer a Breakup Fee for any credit bid, or for any bid by TREW, CP7 Warming Bag, L.P., the L. Catterton Fund, or any of their affiliates.

26.     Any agreement to provide a Breakup Fee would be expressly conditioned on the Court's approval, and the Debtors' consummation, of a sale of the applicable Assets to a Successful Bidder that is not the stalking horse bidder for such Assets (an "**Alternative Transaction**").  The Breakup Fee will be an administrative expense claim against the Debtor's estate under section 503(b) of the Bankruptcy Code but payable solely from the cash proceeds of an Alternative Transaction.  In the event that the Debtors agree to a Breakup Fee, and an Alternative Transaction does not close for any reason, then the Breakup Fee will not be paid by the Debtors, their estates, or any other person or party, and no administrative obligation will be created, and any agreement by the Debtors to pay a Breakup Fee will provide and acknowledge the same.

27.     The Qualified Bidder that might be selected as a stalking horse will have expended considerable time, money, and energy pursuing and negotiating the transaction.  Accordingly, the Debtors may not be able to find a third party Qualified Bidder willing to serve as a stalking horse without having the flexibility to offer the Breakup Fee.  Further, such fee is warranted in light of

the benefit to the Debtors' estate and creditors of providing a market-based indication of value to open the Auction and from the increased certainty of a transaction.

## V.    SALE NOTICE

28.    The Debtors will cause the Sale Notice, substantially in the form attached as **Exhibit 2** to the Bid Procedures Order, to be served at least 21 days in advance of the Sale Hearing on the following parties or their respective counsel, if known: (a) the Sale Notice Parties (as defined in the Bid Procedures); (b) counsel to TREW; (c) all parties who have expressed a written interest in some or all of the Debtors' assets; (d) all known holders of liens, encumbrances, and other claims secured by the Debtors' assets; (e) the Internal Revenue Service; (f) all applicable state and local taxing authorities; (g) each governmental agency that is an interested party with respect to a Sale Transaction and transactions proposed thereunder; (h) counsel to any statutory committee appointed in these cases, and (i) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  In addition, the Debtors will file a list of executory contracts and unexpired leases that are potentially subject to assumption and assignment in connection with this sale process, and proposed cure amounts, no later than October 9, 2024, and will serve  the Assumption and Assignment Notice, substantially in the form attached as **Exhibit 3** to the Bid Procedures Order, on such counterparties.  In addition, within one business days after entry of the Bid Procedures Order, or the Debtors will provide notice of the Sale Hearing through the publication of the Sale Notice on the website maintained by the Debtors' claims agent, to provide notice to any other potential interested parties.

29.    The Debtors respectfully submit that the Sale Notice, substantially in the form attached as Exhibit 2 to the Bid Procedures Order, complies with Bankruptcy Rule 2002 and provides reasonable, timely and adequate notice of the proposed Sales, the Bid Procedures, the

Auction, and the Sale Hearing, and the relevant deadlines for any objections thereto, to the Debtors' creditors and all other parties-in-interest that are entitled to such notice.  Further, the Debtors submits that the proposed objection deadlines are reasonable and appropriate under the circumstances and provide parties in interest with adequate notice consistent with the Bankruptcy Rules and the Local Rules.

30.     The Debtors further submit that the notice to be provided via the Assumption and Assignment Notice is reasonably calculated to provide all contract or lease counterparties with proper notice of the potential assumption and assignment of their executory contracts or unexpired leases, any cure costs relating thereto and related procedures, including without limitation the objection deadlines thereunder.   Among other things, as set forth in the Assumption and Assignment Notice, counterparties may request to receive adequate assurance information by email after the Bid Deadline.  As such, the proposed Assumption and Assignment Notice is appropriate and sufficient under the circumstances.

31.     Overall, the notice to be provided through the Sale Notice and the method of service proposed herein complies with the requirements set forth in Bankruptcy Rule 2002 and constitutes good and adequate notice of the Bid Procedures and the subsequent proceedings related thereto. Accordingly, the Debtors request that the Court approve the notice procedures and objection deadlines set forth in this Sale Motion, including the form and manner of service of the Sale Notice, and that no other or further notice of the Sale, the Bid Procedures or the Auction is required.

## VI.   SUMMARY OF THE ASSUMPTION AND ASSIGNMENT PROCEDURES

32.     The Debtors seek entry of the Assumption and Assignment Procedures to facilitate the fair and orderly assumption and assignment of the Assigned Contracts in connection with the Sale Transactions. Because the Bid Procedures Order sets forth the Assumption and Assignment

Procedures in detail, they are not restated herein. Generally, however, the Assumption and Assignment Procedures: (a) outline the process by which the Debtors will serve notice to all counterparties to the Assigned Contracts regarding the proposed assumption and assignment notice with cure amounts to be subsequently filed, if any, informing such parties of their right and the procedures to object thereto, and (b) establish objection and other relevant deadlines, and the manner for resolving disputes relating to the assumption and assignment of the Assigned Contracts to the extent necessary.

**BASIS FOR RELIEF REQUESTED**

## I.   THE BID PROCEDURES ARE IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND SHOULD BE APPROVED

33.     The Bankruptcy Code authorizes debtors to sell property outside of the ordinary course with court approval.  11 U.S.C. § 363(b).  A paramount goal in any such sale is to maximize the proceeds received for the benefit of creditors. *See In re Mushroom Transp. Co.,* 382 F.3d 325, 339 (3d Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Barn Stores, Inc.,* 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").  Bidding procedures are commonly recognized to be appropriate in bankruptcy sales and for maximizing value by facilitating a fair and orderly sale process, enhancing competitive bidding, and providing a market test of the value of the assets being sold.  *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

34.     The Debtors submit that the Bid Procedures provide a fair, orderly and uniform mechanism by which interested buyers can submit offers for the Assets and will produce a competitive and fair bidding process.  The Bid Procedures allow for the sale process and Auction, if any, to be conducted in a fair and transparent manner that encourages participation by bidders

capable of consummating a timely transaction.  The Debtors believe that the Bid Procedures will promote active bidding from interested parties, are not likely to dissuade any serious potential bidder, and will result in the best and highest offer reasonably available for such assets.

35.     At the same time, the Bid Procedures provide the Debtors with a structured opportunity to consider competing bids and identify the highest or otherwise best offers.  The prepetition and postpetition marketing efforts will ensure that the Debtors obtain fair value by testing the marketplace. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable.

36.     The Assets have already been subject to a comprehensive marketing process as described above, with multiple parties conducting significant due diligence and expressing interest in some or all of the Assets.  However, the Bid Procedures provide an additional opportunity for parties to engage in the process, conduct due diligence and submit bids.  A lengthier process is not likely to benefit potential bidders, all of whom have had extensive time to engage in due diligence and will have yet more time to do so during this process, or deliver additional value for the estates. In sum, the Debtors believe that the proposed Bid Procedures provide an appropriate framework for expeditiously establishing that the estates are receiving the highest or otherwise best offer for the Assets to be sold.  Accordingly, the proposed Bid Procedures are reasonable, appropriate, and within the Debtors' reasonable exercise of their sound business judgment under the circumstances.

37.     Courts in this District routinely approve procedures substantially similar to those requested herein.  *See, e.g.*, *In re MRRC Hold Co.,* (CTG) (Bankr. D. Del. July 2, 2024); *In re SIO2 Medical Products, Inc., No. 23-10366* (JTD) (Bankr. D. Del. Apr. 25, 2023); *In re Lucira Health, Inc.*, No. 23-10242 (MFW) (Bankr. D. Del. Mar. 27, 2023); *In re Performance*

*Powersports Group Holdings, Inc.*, No. 23-10047 (LSS) (Bankr. D. Del. Feb. 27, 2023); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Jul. 16, 2021).

38.     In sum, the proposed Bid Procedures provide an appropriate framework for expeditiously establishing that the Debtors' estates are receiving the best or otherwise highest offer for the Assets to be sold. Accordingly, the proposed Bid Procedures should be approved as being reasonable, appropriate, and within the Debtors' reasonable exercise of their sound business judgment under the circumstances.

### A.     *The Form and Manner of Service of the Sale Hearing Notice Should Be Approved*

39.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with twenty-one days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the relevant Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

40.     As noted above, within one business day of entry of the Bid Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Sale Notice upon the following parties or their respective counsel, if known: (a) the Sale Notice Parties (as defined in the Bid Procedures); (b) counsel to TREW; (c) all parties who have expressed a written interest in some or all of the Debtors' assets; (d) all known holders of liens, encumbrances, and other claims secured by the Debtors' assets; (e) the Internal Revenue Service; (f) all applicable state and local taxing authorities; (g) each governmental agency that is an interested party with respect to a Sale Transaction and transactions proposed thereunder; (h) counsel to any statutory committee appointed in these cases, and (i) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  In addition, the Debtors will file a list of executory contracts and unexpired leases that are potentially subject to assumption and assignment in connection with

this sale process, and proposed cure amounts, no later than October 9, 2024, and serve the Assumption and Assignment Notice on such counterparties.

41.     In addition, within one business day after entry of the Bid Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will provide notice of the Sale Hearing through the publication of the Sale Notice on the website of the Debtors' claims agent, https://cases.stretto.com/BFI, to provide notice to any other potential interested parties.

42.     The Debtors submit that notice of this Sale Motion, the Bid Procedures Hearing, and the Sale Hearing, coupled with service of the Sale Notice and the Assumption and Assignment Notice as provided for herein, constitutes good and adequate notice of the Sale Transactions and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

**B.     _The Assumption and Assignment Procedures Are Appropriate and Should Be Approved_**

43.     As set forth above, the Sale Transactions contemplate the assumption and assignment of contracts to the Successful Bidder(s) (as defined in the Bid Procedures) arising from the Auction, if any. In connection with this process, the Debtors believe it is necessary to establish the Assumption and Assignment Procedures by which: (a) the Debtors and contract counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of contracts and/or related cure amounts.

44.     As set forth in the Bid Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any contract be deemed to consent to the assumption and assignment of the applicable contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order (as defined in the Bid Procedures), along

with any cure amounts (which will be subsequently filed). *See, e.g.*, *In re Boy Scouts of Am.*, 642 B.R. 504, 569 (Bankr. D. Del. 2022) ("The lack of objection of a [creditor] is also consensual for purposes of § 363 and, again, permissible under § 363(f)(2)."); *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (same).

45.     The Debtors believe that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice to parties to the executory contracts and leases, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request that the Court approve the Assumption and Assignment Procedures set forth in the Bid Procedures Order.

## C. *The Sale Should Be Approved as an Exercise of Sound Business Judgment*

46.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999) (same).

47.     If the proposed sale pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such sale should be approved.  *See, e.g.,* *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions.").

1. **A Sound Business Purpose Exists for the Sale.**

48.     As set forth above, the Debtors have a sound business justification for selling their assets. ***First***, the Debtors are unable to continue operations for any longer. As set forth in the First Day Declaration, the Debtors have substantial liabilities and are experiencing significant operating losses.  The Debtors lack access to capital and have no other reasonably available alternatives. The sale of the Debtors' assets as a going concern as contemplated herein will maximize the value for their estates and creditors as compared to the only other alternatives.

49.     ***Second***, the sale of the Debtors' assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for such assets. Consequently, the ultimately successful bids, after being subject to a "market check" in the form of the relevant Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offers for the assets and will provide a greater recovery for their estates than any known or practicably available alternatives. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "Section 363(b) sale transaction does not require an auction procedure, . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

50.     Thus, the Debtors submit that the Successful Bidder's purchase agreement will constitute the highest or otherwise best offer for the assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternatives. Moreover, the sale will help preserve over 2,100 jobs, will keep restaurants in business thereby occupying commercial real estate that might otherwise go empty, and provides the best chance of recovery for creditors. Furthermore, the sale will help avoid administrative insolvency for these cases. As such, the Debtors' determination to sell the assets through an Auction process, if applicable, and subsequently to enter into the Successful Bidder's purchase agreement will be a valid and sound

exercise of the Debtors' business judgment. Therefore, the Debtors request that the Court make a finding that the proposed sale of the assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

### 2.     <u>Adequate and Reasonable Notice of the Sale Will Be Provided.</u>

51.     The Sale Notice: (a) will be served in a manner that provides parties in interest notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale Transactions or the assumption and assignment of contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale Transactions. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bid Procedures Order after notice and a hearing before it is served on parties in interest.

### 3.     <u>The Sale Transactions and Purchase Price Will Reflect Fair Value.</u>

52.     It is well-settled that the result of a court-approved auction process after exposure to the market is presumed to be a full and fair price. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, \*4 (Bankr. D. Del. 2001) (while a "Section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

53.     Moreover, as described herein, Kroll will continue to market the Debtors' assets and solicit other offers consistent with the Bid Procedures, including, for example, by contacting presumably interested parties as well as previously solicited parties, by continuing to provide acceptable bidders with data room access and requested information, by considering a variety of alternative transaction structures, and otherwise by assisting the Debtors with all efforts to increase

transaction value. In this way, the number of bidders that are eligible to participate in a competitive

Auction process will be maximized; or, if no Auction is held because no Auction is necessary after

a market process, the Successful Bidder's purchase price will be fair value.

> ### 4.      Section 363(m) Protections for the Successful Bidder(s) Are Warranted.

54.      The Debtors request that the Court find the Successful Bidder(s) are entitled to the

benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with

the sale of the assets.

55.      Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization
> under subsection (b) or (c) of this section of a sale or lease or
> property does not affect the validity of a sale or lease under
> such authorization to an entity that purchased or leased such
> property in good faith, whether or not such entity knew of the
> pendency of the appeal, unless such authorization and such
> sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

56.      Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold

pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser

leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good

faith," courts have held that a purchaser shows its good faith through the integrity of its conduct

during the course of the sale proceedings, finding that where there is a lack of such integrity, a

good faith finding may not be made. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143,

147 (3d Cir. 1986) (citation and quotation omitted) ("Typically, the misconduct that would destroy

a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed

buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (same).

57.     The Debtors submit that any Successful Bidder is or would be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and that its Asset Purchase Agreement is or would be a good-faith agreements on arms'-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[5] ***First***, there have been extensive marketing efforts and any consideration to be received by the Debtors pursuant to a negotiated and market-tested Asset Purchase Agreement will be fair and reasonable. ***Second***, the parties will have entered into the Asset Purchase Agreement in good faith and after extensive, arm's-length negotiations, during which all parties were represented by competent counsel, and any sale agreement with a Successful Bidder will be the culmination of a competitive Auction process in which all parties will presumably be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis. ***Third***, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale Transactions or Stalking Horse Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. And, with respect to potential bidders, the Bid Procedures (and the negotiated cap on any credit bid by the Lender) are designed to ensure that no party is able to exert undue influence over the process. ***Finally***, any offers will have been evaluated and approved by the Debtors in consultation with

---

[5]     The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder(s) arising from the Auction. Pursuant to the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bid Procedures. In addition, the Debtors will not choose as the Successful Bidder or Backup Bidder (as defined in the Bid Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted and will be prepared to present the Court with sufficient evidence at the Sale Hearing to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

their advisors, and any other bids that the Debtors ultimately determine to be a successful bid will have been evaluated in a similar fashion. Accordingly, the Debtors believe that the Successful Bidder(s) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

**5.  The Sale Transactions Should be Approved "Free and Clear" Under Section 363(f).**

58.   Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a *bona fide* dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

59.   Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, or encumbrances), except with respect to any interests that may constitute an assumed liability under the applicable purchase agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

60.   The Debtors submit that with respect to any interest that will not be an assumed liability, they satisfy or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale Transactions, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors accordingly request authority to convey the assets to the Successful Bidder(s) free and clear of all

liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, or encumbrances, with any such liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, or encumbrances to attach to the proceeds of the Sale Transactions.

### 6. Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.

61.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value. Absent cause for restricting credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim. *See Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459 (3d Cir. 2006) (explaining that "[i]t is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k).").

62.     Here, TREW has valid secured claims against the Debtors and is entitled to credit bid some or all of the claims secured by its collateral pursuant to section 363(k) of the Bankruptcy Code.   Moreover, the DIP Order provides such rights for TREW.   DIP Order ¶ 17(ii). Accordingly, any credit bid contemplated by TREW should be authorized.

## II.    THE STALKING HORSE PROTECTIONS SHOULD BE AUTHORIZED

63.     The Debtors seek approval from the Court to designate a Qualified Bid for substantially all assets of the BurgerFi business, or of the Anthony's business, as a "stalking horse"

bid, at any time after entry of the Bidding Procedures Order prior to October 11, 2024 and in consultation with any official committee appointed in this case, and to offer that bidder the Breakup Fee. Such relief is warranted here to induce an appropriate Qualified Bid that will preserve going concern value by reassuring customers and employees of continuity and will incentivize other parties to pursue the Debtor's assets to avoid a competitive disadvantage.

64.     The Debtors' assets and these cases are subject to litigation uncertainties that may result in cautious bidding. The Breakup Fee will encourage potential bidders to invest time, money and effort into preparing and submitting a bid, which would benefit the Debtors and their estates by setting a value floor for the assets to be conveyed and by establishing a market-based indication of value.

65.     Despite extensive prepetition marketing efforts, the Debtors have not been able to obtain any binding purchase agreement with a satisfactory purchase price for either the BurgerFi business or the Anthony's business on a going-concern basis. The Breakup Fee may provide the incentive required to induce a Qualified Bidder to submit or increase its bid prior to the Auction, and to the extent bids can be improved prior to the Auction, a higher floor is established for further bidding. Thus, even if such bidder is offered the Breakup Fee and ultimately is not the Successful Bidder, the Debtors and their estates will have benefited from the higher floor established by the improved bids. The Debtors submit that the proposed Breakup Fee will not chill bidding – instead, it will only be offered if the Debtors receive a Bid that is worthy of such protection.

66.     Thus, the Debtors submit that the Breakup Fee, to the extent offered by the Debtors and approved by the Court following such would be (a) an actual and necessary cost of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code, (b) commensurate to the real and substantial benefit conferred on the Debtors' estates by such bidder,

and (c) reasonable and appropriate in light of, among other things (i) the size and nature of the asset sale contemplated and comparable transactions, (ii) the substantial efforts that will need to be expended by the such bidder, (iii) the benefits that such bidder will have provided to the Debtors' estate, their creditors and other parties in interest, and (d) necessary to induce such Qualified Bidder to serve as a "stalking horse" bidder and to continue to pursue the Asset sale transaction. *See generally In re 95 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) ("breakup fees and other strategies may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking."); *In re Integrated Res., Inc.*, 147 B.R. 650, 660-61 (S.D.N.Y. 1992) (breakup fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

67.    The Debtors submit that the Breakup Fee is consistent with the applicable standards and should be approved as fair and reasonable. *See, e.g., In re O'Brien Env't Energy. Inc.*, 181 F.3d 527 (3d Cir. 1999) (requiring bidding incentives such as breakup frees to provide benefit to the estate); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("the allowability of breakup fees, like that of other administrative expenses, depends on the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate").

68.    First, the Debtors and their professionals will negotiate with any and all potential bidders to submit a Qualified Bid and serve as the stalking horse, which dispenses with any implication of self-dealing or a lack of arm's-length negotiations under the circumstances. Second, the Debtors believe, based on reasoned business judgment and in consultation with the

Consultation Parties, that the ability to designate a Qualified Bid to serve as a "stalking horse" is warranted and is likely to increase the value to the estate from the proposed sale process by signaling the existence of a contractually-committed bidder at a floor price believed to be fair and reasonable while providing the opportunity of potentially receiving a higher or otherwise better offer which, absent such a bid floor, might not otherwise be realized.  Additionally, the proposed Breakup Fee is within the range of such fees approved by this and other courts.  Further, if the Breakup Fee were to be paid, it will be because the Debtors have received a higher or otherwise better offer.

## III.   THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS SHOULD BE APPROVED

### 1.   The Assumption and Assignment of Contracts Reflects the Debtors' Reasonable Business Judgment.

69.     To facilitate and effectuate the sale of the assets, the Debtors are seeking authority to assign or transfer executory contracts to the Successful Bidder(s) arising from the Auction, if any, to the extent required by such bidders.

70.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign their executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *Grp. of Inst'l Invrs. v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying section 77(b) of the Bankruptcy Act, rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas*

*Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the [Bankruptcy] Code.").

71.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale Transactions as a sound exercise of the Debtors' business judgment: ***First***, the Assigned Contracts are necessary to operate the assets and, as such, they are essential to inducing the best offer for the assets. ***Second***, it is unlikely that any purchaser would want to acquire the assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction. ***Last***, the Assigned Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key constituents in the Chapter 11 Cases.

72.     Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

### 2.     Defaults Under the Assigned Contracts Will Be Cured Through the Sale <u>Transactions.</u>

73.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. This "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the

debtor's bargain." *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted).

74.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied. Because the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

### 3.    Non-Debtor Parties Will Be Adequately Assured of Future Performance.

75.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance' was adopted from Uniform Commercial Code Section 2-609" and is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, the degree of assurance necessary falls considerably short of an absolute guaranty. *In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002) (citing *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994)). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See Dura Auto.*, 2007 WL 7728109, at *97 (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding); *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (same).

76.     The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder(s) will be satisfied. As required by the Bid Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assigned Contracts assigned to the Successful Bidder. Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder(s) to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts. The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts as set forth in the Successful Bidder's Asset Purchase Agreement.

## III.    The Court Should Find That Any Sale of the Assets Does Not Require the Appointment of a Consumer Privacy Ombudsman

77.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.  Here, any sale or use of customer information will only be used in accordance with the Debtors' privacy policy. Therefore, appointment of a consumer privacy ombudsman is unnecessary.

## IV.    RELIEF UNDER BANKRUPTCY RULES 6004(h) AND 6006(d) IS APPROPRIATE

78.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order

authorizing the trustee to assign an executory contract or unexpired lease … is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

79.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although the Bankruptcy Rules and Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006). If an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.

80.     To maximize the value received for the assets and comply with the terms of the DIP Loan, the Debtors seek to close the Sale Transactions on or before October 31, 2024. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## <u>RESERVATION OF RIGHTS</u>

81.     Nothing contained in this Sale Motion or any actions taken by the Debtors pursuant to relief granted in the order is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against any Debtor; (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Sale Motion; (e) a request or authorization to assume

any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code other than the Assigned Contracts; (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Sale Motion are valid; and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### **<u>NO PRIOR REQUEST</u>**

82.    No prior request for the relief sought herein has been made in any forum.

*[ remainder of page intentionally left blank ]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Bid Procedures Order, substantially in the form attached hereto as **Exhibit A**, and enter the Sale Order after the Sale Hearing, substantially in the form attached hereto as **Exhibit B**, and grant such other and further relief as the Court may deem just and appropriate.

Dated:    September 20, 2024
          Wilmington, Delaware

**RAINES FELDMAN LITTRELL LLP**

*/s/ Thomas J. Francella, Jr.*
Thomas J. Francella, Jr. (No. 3835)
1200 N. Broom Street
Wilmington, DE 19806
Telephone: (302) 772-5805
Email: tfrancella@raineslaw.com

- and -

Hamid R. Rafatjoo (*pro hac vice*)
Robert S. Marticello (*pro hac vice*)
1900 Avenue of the Stars, 19th Floor
Los Angeles, CA 90067
Telephone: (310) 440-4100
Email: hrafatjoo@raineslaw.com
        rmarticello@raineslaw.com

- and -

Carollynn H.G. Callari (*pro hac vice*)
David S. Forsh (*pro hac vice*)
1350 Avenue of the Americas, 22nd Floor
New York, NY 10019
Telephone: (917) 790-7109
Email: ccallari@raineslaw.com
        dforsh@raineslaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

# EXHIBIT A

**Proposed Bid Procedures Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BURGERFI INTERNATIONAL, INC., *et al.*,[1] | Case No. 24-12017 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Related Docket No. ___** |

**ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS (B) AUTHORIZING THE DEBTORS TO DESIGNATE A STALKING HORSE BID, (C) SCHEDULING AN AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (E) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF**

This matter came before the Court on _____, 2024 (the "Bid Procedures Hearing") upon the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of the Debtors' Assets, (B) Authorizing the Debtors to Designate a Stalking Horse Bid, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. [•]] (the "**Sale Motion**")[2] filed by the debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"); the Court

---

[1]   The last four digits of the tax identification number of BurgerFi International, Inc. and of Anthony's Pizza Holding Company, LLC are 8815 and 4718, respectively. A list of all Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, is available at https://cases.stretto.com/BFI. The Debtors' mailing address is 200 E Las Olas Blvd., Suite 1400, Fort Lauderdale, FL 33301.

[2]   Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Sale Motion or in the Bid Procedures, as applicable.

having reviewed the Sale Motion and declarations filed in support thereof, and having considered

the statements of counsel and the evidence adduced with respect to certain of the relief requested

in the Sale Motion at the Bid Procedures Hearing; and after due deliberation, this Court having

determined that the legal and factual bases set forth in the Sale Motion establish just cause for the

relief granted herein; and it appearing that the relief requested in the Sale Motion is in the best

interests of the Debtors, their estates and their creditors, and the Debtors having demonstrated

good, sufficient and sound business justifications for the relief granted herein;

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

A.      <u>Jurisdiction and Venue</u>. The Court has jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue

is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      <u>Statutory and Legal Predicates</u>. The statutory and legal predicates for the relief

requested in the Sale Motion are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code;

Bankruptcy Rules 2002, 6004, 6006, 9007, and 9008; and Local Rules 2002-1 and 6004-1.

C.      <u>Sale Process</u>. The Debtors and their advisors have engaged pre-petition with a

number of potentially interested parties to solicit and develop the highest and otherwise best

stalking horse bid or other offers for the Assets.

D.      <u>Bid Procedures</u>. The Debtors have articulated good and sufficient business reasons

for the Court to approve the bidding procedures attached hereto as **Exhibit 1** (the "**Bid**

**Procedures**"). The Bid Procedures are fair, reasonable, and appropriate and are designed to

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of
law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule
9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted
as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted
as such.

2

maximize the value of the proceeds of one or more sales (each, a "**Sale Transaction**") for all or any part of the Debtors' assets (the "**Assets**"). The Bid Procedures were negotiated in good faith and at arm's length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Assets.

E.      Sale Notice. The sale notice, the form of which is attached as **Exhibit 2** (the "**Sale Notice**"), is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Sale Hearing (as defined in the Bid Procedures), the Bid Procedures, the Sale Transaction(s), and all relevant and important dates and objection deadlines with respect to the foregoing, and no other or further notice of the Sale Hearing, the Sale Transaction(s), or the Auction shall be required.

F.      Assumption and Assignment Provisions. The Debtors have articulated good and sufficient business reasons for the Court to approve the assumption and assignment procedures set forth herein and in the Bid Procedures (the "**Assumption and Assignment Procedures**") and the assumption and assignment notice attached hereto as **Exhibit 3** (the "**Assumption and Assignment Notice**"), which are fair, reasonable, and appropriate. The Assumption and Assignment Procedures comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

G.      Assumption and Assignment Notice. The Assumption and Assignment Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Assumption and Assignment Procedures, as well as any and all objection deadlines related thereto, and no other or further notice shall be required for the Sale Motion and the procedures described therein, except as expressly required herein.

H.      <u>Notice</u>. Notice of the Sale Motion, the proposed Bid Procedures, the proposed designation of a stalking horse and the Bid Procedures Hearing was (i) appropriate and reasonably calculated to provide all interested parties with timely and proper notice, (ii) in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules and (iii) adequate and sufficient under the circumstances of the Debtors' Chapter 11 Cases, such that no other or further notice need be provided except as set forth in the Bid Procedures and the Assumption and Assignment Procedures. A reasonable opportunity to object and be heard regarding the relief granted herein has been afforded to all parties in interest.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Sale Motion is GRANTED as set forth herein.

2.      All objections to the relief granted in this order (the "**Order**") that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits with prejudice.

### A.      The Bid Procedures

3.      The Bid Procedures attached hereto as **<u>Exhibit 1</u>** are hereby approved, are incorporated herein by reference, and shall govern the bids and proceedings related to the sale of the Assets and the Auction. The procedures and requirements set forth in the Bid Procedures, including those associated with submitting a "Qualified Bid," are fair, reasonable and appropriate, and are designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest. The Debtors are authorized to take all actions necessary or appropriate to implement the Bid Procedures.

4.      The failure to specifically include or reference any particular provision of the Bid Procedures in the Sale Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being the Court's intent that the Bid Procedures are approved in their entirety, as is fully set forth in this Order.

5.      Subject to this Order and the Bid Procedures, the Debtors, in the exercise of their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law and in consultation with the Consultation Parties, shall have the right to (a) determine which bidders qualify as Qualified Bidders (as defined in the Bid Procedures) and which bids qualify as Qualified Bids, *provided, however* that TREW shall be a Qualified Bidder under all circumstances; (b) make final determinations as to Auction Packages, if any (as defined in the Bid Procedures), (c) select the Baseline Bid; (d) determine the amount of each Minimum Overbid (as defined in the Bid Procedures), (e) determine the Leading Bid (as defined in the Bid Procedures); (f) determine which Qualified Bid is the Successful Bid and which Qualified Bid is the Backup Bid (each as defined in the Bid Procedures) after the Successful Bid; (g) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of this Order or any other applicable order of the Court, the Bid Procedures, the Bankruptcy Code or other applicable law, and/or (iii) contrary to the best interests of the Debtors and their estates; (h) schedule and conduct Sub-Auctions, as necessary; (i) cancel the Auction with respect to any or all of the Assets in accordance with the Bid Procedures; and (j) adjourn or reschedule the Sale Hearing with respect to a Sale Transaction involving any or all of the Assets in accordance with the Bid Procedures; provided, that such determinations, decisions, or actions (i) do not conflict with and are not inconsistent with this Order, the Sale Procedures, the interim and final DIP Orders and DIP Agreement (the "**DIP**

**Documents**"), the Bankruptcy Code, or any order of the Bankruptcy Court, and (iii) are in form and substance acceptable to TREW in its capacity as DIP Lender.

6.      The Debtors shall have the right to, in their reasonable business judgment, and in a manner consistent with their fiduciary duties and applicable law, in consultation with any Stalking Horse Bidder (as defined below) and the Consultation Parties, modify the Bid Procedures, including to, among other things, (a) extend or waive deadlines or other terms and conditions set forth therein, (b) adopt new rules and procedures for conducting the bidding and Auction process, (c) if applicable, provide reasonable accommodations to any Stalking Horse Bidder, or (d) otherwise modify the Bid Procedures to further promote competitive bidding for and maximizing the value of the Assets; provided, that such extensions, waivers, new rules and procedures, accommodations and modifications (i) do not conflict with and are not inconsistent with this Order, the Bid Procedures, the DIP Documents the Bankruptcy Code or any order of the Bankruptcy Court, (ii) are promptly communicated to each Qualified Bidder and (iii) are in form and substance acceptable to TREW.

**B.      The Stalking Horse Bidders**

7.      The Debtors is hereby authorized, in consultation with the Consultation Parties, to offer the Breakup Fee to a Qualified Bidder who agrees to provide a Qualified Bid for all or substantially all of the Assets relating to the BurgerFi restaurants or the Anthony's Coal Fired Pizza restaurants on a going-concern basis that will serve as the "stalking horse" and opening bid at the Auction for such Assets; provided, that (i) no stalking horse bid shall be designated after **October 11, 2024**; (ii) any Breakup Fee shall be payable by the estates only from the proceeds of an alternative sale transaction if and when closed, and (iii) no Breakup Fee shall be offered or payable to TREW, CP7 Warming Bag, L.P., the L. Catterton Fund, or any of their affiliates.  The

Debtors shall promptly file and distribute to active bidders a copy of any stalking horse asset purchase agreement.

### C.    Bid Deadline and Auction

8.    Any Prospective Bidder (as defined in the Bid Procedures) that intends to participate in the Auction must submit in writing to the Bid Notice Parties (as defined in the Bid Procedures) a Bid on or before **October 18, 2024 at 5:00 p.m. (ET)** (the "**Bid Deadline**").  The deadline for the Debtors (in consultation with the Consultation Parties and TREW) to notify Qualified Bidders is **October 19, 2024**, or as soon as practicable thereafter (but prior to the Auction).

9.    The Debtors may consider a Bid for less than all of the Assets (each such Bid, a "**Partial Bid**") if the Debtors receive one or more Partial Bids for the Assets such that, when taken together, and after considering the risks associated with consummating several individual Bids, the Partial Bids collectively constitute a higher and otherwise better bid as compared to the highest and best bid for all or substantially all of the Assets.

10.    The Auction, if required, will be conducted on **October 21, 2024 at 10:00 a.m. (ET)**, at the offices of Raines Feldman Littrell LLP, 1350 Avenue of the Americas, 22nd Floor, New York, NY 10019, or at such other time and place as the Debtors will timely notice. If held, the Auction proceedings will be transcribed or recorded.

11.    Only a Qualified Bidder that has submitted a Qualified Bid shall be eligible to participate in the Auction, subject to any other limitations as the Debtors may reasonably impose in accordance with the Bid Procedures. Qualified Bidders participating in the Auction must appear at the Auction (which appearance must be in person unless the Auction takes place via Zoom), directly or through a duly authorized representative with authority to enter into any bid or asset

purchase agreement that may be presented on behalf of the Qualified Bidder. The Debtors may establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder at the Auction. Notwithstanding the foregoing, the Auction shall be conducted openly, and all creditors shall be permitted with prior registration in accordance with the Bid Procedures to attend in person (or via Zoom if the Auction is held in such manner).

12.     Each Qualified Bidder participating in the Auction shall confirm in writing on the record at the Auction that (a) it has not engaged in any collusion with respect to the Auction or the submission of any bid for any of the Assets, and (b) its Qualified Bid that gained the Qualified Bidder admission to participate in the Auction and each Qualified Bid submitted by the Qualified Bidder at the Auction constitutes a binding, good-faith and *bona fide* offer to purchase the Assets identified in such bids.

13.     In the event the Debtors (in consultation with the Consultation Parties and TREW) determine not to hold an Auction for some or all of the Assets, the Debtors shall file with the Court and cause to be published on the website maintained by Stretto at https://cases.stretto.com/BFI (the "**Claims Agent Website**") a notice of cancellation of the Auction.

14.     No later than **October 22, 2024**, the Debtors will file with the Court, serve on the Sale Notice Parties and cause to be published on the Claims Agent Website, a notice setting forth the results of the Auction (the "**Notice of Auction Results**"), which shall (i) identify each Successful Bidder and each Backup Bidder, (ii) include a copy of each Successful Bid, including any assumption and assignment of Contracts (as defined in the Bid Procedures) contemplated thereby, as well as a copy of, or a summary of the material terms of, each Backup Bid, and (iii) set forth the Post-Auction Objection Deadline, the date, time and location of the Sale Hearing and any

other relevant dates or other information necessary to reasonably apprise the Sale Notice Parties of the outcome of the Auction.

### D.   Notice of Sale Transaction

15.     The Sale Notice, substantially in the form attached hereto as **Exhibit 2**, is approved, and no other or further notice of the proposed sale of the Assets, the Auction, the Sale Hearing, the Sale Objection Deadline or the Post-Auction Objection Deadline shall be required if the Debtors serve on the Sale Notice Parties, and on all known creditors (for whom identifying information and addresses are available to the Debtors), and publish the Sale Notice in the manner provided in the Bid Procedures and this Order.  A copy of the Sale Notice shall also be provided to all parties who have executed confidentiality agreements with the Debtors under the marketing process by Kroll Securities, LLC, the Debtors' proposed investment banker.

16.     Within 1 business day after the entry of this Order, the Debtors shall file with the Court, serve on the Sale Notice Parties, and cause to be published on the Claims Agent Website, the Sale Notice.

### E.   Credit Bidding

17.     TREW shall be deemed to be a Qualified Bidder, and TREW (or its designee) may credit bid pursuant to and subject to section 363(k) of the Bankruptcy Code and thus is not required to provide a Deposit to the Debtors.  TREW (or its designee) has the unqualified right at any time to credit bid on a dollar-for-dollar basis up the amount of the Prepetition Obligations, the DIP Loan Obligations, and DIP Superpriority Claims, if any.

18.     Each counterparty to an unexpired lease of nonresidential real property ("**Landlord**") shall be deemed to be a Qualified Bidder for any bid on such lease, and may offset the proposed purchase price for such lease with all or a portion of the applicable cure amount owed

by the Debtors for such lease.  If a Landlord is the Successful Bidder on its lease, and it is later determined by this Court or agreement by and among the Debtors and the Landlord that the actual cure amount is a lesser amount, then the Landlord shall pay the difference in cash upon the later to occur of (i) the closing of such sale, or (ii) such determination or agreement.

### F.    Sale Hearing and Objection Procedures

19.    Consummation of any Sale Transaction pursuant to a Successful Bid shall be subject to Court approval. The Sale Hearing shall be held before the Court on **October 25, 2024, at 10:00 a.m. (ET)**.

20.    All general objections to any Sale Transaction (each, a "**Sale Objection**") shall be (i) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, (ii) be filed and served no later than **October 17, 2024** (the "**Sale Objection Deadline**").

21.    Following service of the Notice of Auction Results, parties may object (each such objection, a "**Post-Auction Objection**") to: (i) the conduct of the Auction, (ii) adequate assurance of future performance for any Successful Bidder or Backup Bidder, and (iii) the particular terms of any proposed Sale Transaction in a Successful Bid or Backup Bid. Any Post-Auction Objection shall be (a) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, (b) be filed and served no later than **October 24, 2024 at 10:00 a.m. (ET)** (the "**Post-Auction Objection Deadline**").

22.    Any party who fails to file and serve a timely Sale Objection or Post-Auction Objection in accordance with the terms of this Order shall be forever barred from asserting, at the Sale Hearing or thereafter, any Sale Objection or Post-Auction Objection to the relief requested in the Sale Motion, or to the consummation or performance of the applicable Sale Transaction(s),

including the transfer of Assets to the applicable Successful Bidder free and clear of liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to "consent" to such sale for purposes of section 363(f) of the Bankruptcy Code.

### G.    Assumption and Assignment Procedures

23.    The Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all non-Debtor parties, comply in all respects with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, and are approved.

24.    The Assumption and Assignment Notice, substantially in the form attached hereto as **Exhibit 3**, is approved, and no other or further notice of the Debtors' proposed Cure Amounts (as defined in the Assumption and Assignment Notice) with respect to Contracts listed on an Assumption and Assignment Notice is necessary or required. The Assumption and Assignment Notice will be filed no later than **October 9, 2024**, and shall be promptly served on the Sale Notice Parties. When issued, the Assumption and Assignment Notice shall (i) identify the relevant Contract(s), (ii) set forth a good faith estimate of the Cure Amount(s), (iii) include a statement that assumption and assignment of each such Contract is not required nor guaranteed, and (iv) inform such Counterparty of the requirement to file any Contract Objection(s) (as subsequently defined) by the Contract Objection Deadline (as subsequently defined).

25.    Any objection by a Contract counterparty to the Debtors' proposed Cure Amounts (as defined in the Assumption and Assignment Notice) or to assumption and assignment of such Contract that does not relate to the identity or ability to perform of the proposed assignee (each such objection, a "**Contract Objection**") shall (a) be in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, (b) be filed with the Court and served no later than the Sale Objection Deadline.

26.     In accordance with the Bid Procedures, Qualified Bids shall be accompanied by Adequate Assurance Information (as defined in the Bid Procedures) and any Stalking Horse Bidder shall provide Adequate Assurance Information to the Debtors on or before the Bid Deadline. The Debtors shall (i) serve all available Adequate Assurance Information to applicable Counterparties (i) by mail no later than **October 20, 2024**, and (ii) by email no later than **October 20, 2024 at 1:00 pm (ET)** as may be requested by any Counterparty (or counsel thereto), with any such request to be made by email no later than **October 17, 2024** to counsel for the Debtors, subject line "BFI Request for Adequate Assurance." Any Counterparty that receives any Adequate Assurance Information with respect to any Stalking Horse Bidder or any other Qualified Bidder shall review such information on a confidential basis and shall not disclose such information to any party. Such Counterparty may not use or disclose, except to representatives, attorneys, advisors and financing sources ("**Representatives**"), any confidential Adequate Assurance Information for any purpose other than: (a) evaluating whether adequate assurance of future performance as required under the Bankruptcy Code has been provided; and (b) to support an objection to adequate assurance by such Counterparty. Any objection by a Counterparty that includes confidential, non-public Adequate Assurance Information shall be filed under seal, subject to a motion to seal by such Counterparty and approval of this Court.  Any Representative receiving Adequate Assurance Information shall be notified of and shall be deemed to have agreed to, and to be bound by, the confidentiality restrictions set forth in this Order.

27.     Any objection to the proposed assumption and assignment of a Contract on the grounds of the Successful Bidder's (or any other relevant assignee's) adequate assurance of future performance with respect to the Contract or otherwise based on the identity of such assignee (each such objection, an "**Adequate Assurance Objection**") shall (a) be in writing and state, with

specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; and (b) be filed with the Court and served no later than the Post-Auction Objection Deadline.

28.     The Debtors and any objecting Counterparty shall first confer in good faith to attempt to resolve the Contract Objection or Adequate Assurance Objection without Court intervention. If the parties are unable to consensually resolve any such objection prior to the commencement of the Sale Hearing,  the Court shall make all necessary determinations relating to such Objection at a subsequent hearing (each such Objection, an "**Adjourned Objection**"), to be scheduled on at least five (5) days' notice to the applicable Counterparty.

29.     An Adjourned Objection may be resolved after the closing date of the applicable Sale Transaction; provided, however, that such determination must occur before the expiration of the Debtors' deadline pursuant to section 365(d)(4) of the Bankruptcy Code, as such deadline may be extended by an order of the Court. Upon resolution of an Adjourned Objection and the payment of the applicable Cure Amount or other resolution of the assumption and assignment issue, if any, the Contract that was the subject of such Adjourned Objection shall be deemed assumed and assigned to the applicable Successful Bidder as of the closing date of the applicable Sale Transaction or as otherwise set forth in an applicable order. If an Adjourned Objection is resolved in a manner that is less favorable to the Debtors and their estates than set forth in the Assumption and Assignment Notice, whether or not such resolution occurs prior to or after the closing of the applicable Sale Transaction, the applicable assignee may determine that such Contract shall not be assumed and assigned in connection with the applicable Sale Transaction; provided, however, that such determination must occur before the expiration of the Debtors' deadline pursuant to section 365(d)(4) of the Bankruptcy Code, as such deadline may be extended by an order of the Court;

and provided further that no such determination shall reduce the purchase price or other consideration to be received by the Debtors and their estates in such Sale Transaction. All other objections to the proposed assumption and assignment of the Debtors' right, title and interest in, to and under a Contract shall be heard at the Sale Hearing.

30.     If a Counterparty fails to file and serve a Contract Objection by the Sale Objection Deadline, such Counterparty shall be deemed to have consented to the assumption and assignment of the Contract in connection therewith and as set forth in the Assumption and Assignment Notice. In such case, unless otherwise agreed in writing by the Counterparty and the applicable Successful Bidder, the Cure Amounts set forth in the applicable Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract and satisfy the requirements of section 365(b) of the Bankruptcy Code.

31.     If a Counterparty fails to file an Adequate Assurance Objection by the Post-Auction Objection Deadline, such Counterparty shall be deemed to have consented to, and the applicable Successful Bidder (or any other relevant assignee) shall be deemed to have provided, adequate assurance of future performance with respect to the Contracts of such Counterparty in accordance with sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code and, if applicable, section 365(b)(3) of the Bankruptcy Code.

32.     Successful Bidders may, pursuant to the terms of an applicable asset purchase agreement executed with the Debtors, designate (a) for assumption and assignment Contracts that were not originally included in the Assets to be acquired in connection with the applicable Successful Bid and (b) Contracts that previously were included among the Assets to be acquired in connection with the applicable Successful Bid as "excluded assets" that will not be assigned to or otherwise acquired by the Successful Bidder. The Debtors shall use commercially reasonable

efforts to, as soon as reasonably practicable after the Debtors receive notice of any such designation, file with the Court, (i) serve on the applicable Counterparties and cause to be published on the Claims Agent Website, a notice of such designation containing sufficient information to apprise Counterparties of the designation of their respective Contracts, and (ii) serve the Adequate Assurance Information of such bidders (if not previously provided) on the applicable Counterparties or counsel thereto by overnight mail and by email as provided in paragraph 33 above.  Counterparties receiving such notices shall have seven (7) days to object to such notice. Nothing in this Order or any asset purchase agreement shall modify the Debtors' deadline to assume or reject leases pursuant to section 365(d)(4) of the Bankruptcy Code, as such deadline may be extended by further order of this Court.

33.    As soon as reasonably practicable after the closing of a Sale Transaction, the Debtors will file with the Court, serve on the applicable Counterparties and cause to be published on the Claims Agent Website, a notice containing the list of Contracts that the Debtors assumed and assigned pursuant to any asset purchase agreement with a Successful Bidder, and the applicable assignment effective date for each Contract.

34.    The inclusion of a Contract or Cure Amounts with respect to any Contract on any Assumption and Assignment Notice or any Notice of Auction Results, shall not constitute or be deemed a determination or admission by the Debtors, any Successful Bidder or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code, and shall not be a guarantee that such Contract ultimately will be assumed or assigned. The Debtors reserve all of their rights, claims and causes of action with respect to each Contract listed on any Assumption and Assignment Notice.

### H.    Other Related Relief

35.    All persons and entities that participate in the Auction or bidding for any Asset during the Sale Transaction process shall be deemed to have knowingly and voluntarily (a) consented to the core jurisdiction of the Court to enter any order related to the Bid Procedures, the Auction or any other relief requested in the Sale Motion or granted in this Order, (b) waived any right to a jury trial in connection with any disputes relating to the Bid Procedures, the Auction or any other relief requested in the Sale Motion or granted in this Order, and (c) consented to the entry of a final order or judgment in connection with any disputes relating to the Bid Procedures, the Auction or any other relief requested in the Sale Motion or granted in this Order, if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the relevant parties.

36.    The Debtors are authorized to take all steps and pay all amounts necessary or appropriate to implement the relief granted in this Order.

37.    This Order shall be binding on the Debtors and its successors and assigns, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

38.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39.    To the extent any provisions of this Order are inconsistent with the Sale Motion, the terms of this Order shall control. To the extent any provisions of this Order are inconsistent with the Bid Procedures, the terms of this Bid Procedures shall control.

40.    Notwithstanding the applicability of any of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014 or any other provisions of the Bankruptcy Rules or the Local Rules stating the contrary, the terms and provisions of this Order shall be immediately effective and enforceable upon its

entry, and any applicable stay of the effectiveness and enforceability of this Order is hereby waived.

41.     The Debtors, in consultation with the Consultation Parties, are authorized to make non-substantive changes to the Bid Procedures, the Assumption and Assignment Procedures, and any related documents with copy of any such revised documents to the Office of the U.S. Trustee, without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors.

42.     This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

## **EXHIBIT 1**

**Bid Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BURGERFI INTERNATIONAL, INC., *et al.*,[1] | Case No. 24-12017 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Related Docket No. ___** |

## BID PROCEDURES

The debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") will use the process and procedures set forth below (the "Bid Procedures") for the sale of all or any part of their assets (collectively, the "Assets") in one or more lots to one or more successful bidders (each, a "Sale Transaction").

The Bid Procedures have been approved by order of the United States Bankruptcy Court for the District of Delaware (the "Court") entered on October __, 2024 [Docket No. ___] (the "Bid Procedures Order").  Capitalized terms used and not defined herein have the meaning ascribed in the Bid Procedures Order

### I.    ASSETS FOR SALE

The Debtors anticipate selling substantially all assets of their BurgerFi restaurants in one transaction and substantially all assets of their Anthony's Coal Fired Pizza restaurants in another transaction.  However, all interested parties have the opportunity to bid on all or any part of the Assets in accordance with these Bid Procedures.  The Debtors invite and will consider the sale of any or all of the Assets by a single bid from a single bidder or by multiple bids from multiple bidders.

The sale of the Assets shall be subject to a competitive bidding process as set forth herein and approval by the Court pursuant to Sections 105, 363, and 365 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

Any bid for an individual Asset, even if such bid is the highest or otherwise best bid for such individual Asset, is subject to higher or otherwise better bids on packages of Assets that

---

[1]    The last four digits of the tax identification number of BurgerFi International, Inc. and of Anthony's Pizza Holding Company, LLC are 8815 and 4718, respectively. A list of all Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, is available at https://cases.stretto.com/BFI. The Debtors' mailing address is 200 E Las Olas Blvd., Suite 1400, Fort Lauderdale, FL 33301.

include the individual Asset. Additionally, any bid on all of the Assets is subject to bids on individual Assets or packages of Assets that are, in the aggregate, higher or otherwise better bids.

Any party interested in submitting a bid for any of the Assets should contact Kroll Securities, LLC, Joshua Benn, joshua.benn@kroll.com.

## II.      KEY DATES AND DEADLINES

| SALE PROCESS KEY DATES AND DEADLINES | |
| --- | --- |
| **October 9, 2024** | Deadline for the Debtors to file and serve the Sale Notice and publish it on the website for this case. |
| **October 9, 2024** | Deadline for the Debtors to file the Assumption and Assignment Notice. |
| **October 11, 2024** | Deadline for Designating a Stalking Horse Bid |
| **October 17, 2024** | Sale Objection Deadline |
| **October 18, 2024 at 5:00 p.m. (ET)** | Bid Deadline |
| **October 21, 2024 at 10:00 a.m. (ET)** | Auction (if necessary) |
| **October 25, 2024 at 10:00 a.m. (ET)** | Sale Hearing |
| **October 28, 2024** | Deadline for entry of Sale Order |
| **October 31, 2024** | Deadline to consummate approved Sale Transactions |

## III.      DUE DILIGENCE

The Debtors have made information relating to the Assets available in a confidential electronic data room (the "Data Room"). Each person or entity that desires to participate in the sale process (each, a "Prospective Bidder") and seeks access to the Data Room must first deliver to each of the Bid Notice Parties (as defined herein) the following:

     A.     an executed confidentiality agreement in form and substance satisfactory to the Debtors (unless such party is already a party to an existing confidentiality agreement with the Debtors that is acceptable to the Debtors for this due diligence process, in which case such agreement shall govern) regarding: (i) the

nondisclosure of confidential information, (ii) prohibitions on contacting third parties in connection with a Sale Transaction, (iii) covenants to not solicit employees of the Debtors, (iv) prohibitions on purchasing or otherwise acquiring the Debtors' debt and equity securities, and (v) the survival of certain provisions of the Confidentiality Agreement; and

B.    sufficient information to allow the Debtors to determine that the Prospective Bidder seeks to access the Data Room for a bona fide purpose consistent with the Bid Procedures and has the financial and managerial wherewithal to submit a Qualified Bid and to consummate the Sale Transaction contemplated thereby.

The Debtors shall provide each Prospective Bidder who satisfies the foregoing requirements (as determined by the Debtors in their discretion) access to the Data Room.  The Debtors will endeavor to accommodate all reasonable requests from any Stalking Horse Bidder and any Prospective Bidders for additional information and due diligence access.

The Debtors shall provide TREW Capital Management Private Credit 2 LLC ("TREW") and any Stalking Horse Bidder (as defined herein) with Data Room access, and any information provided to a Prospective Bidder that has not already been provided to them.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever (a) to any person or entity who (1) is not a Prospective Bidder, (ii) does not comply with the participation requirements set forth above, or (2) in the case of competitively sensitive information, is a competitor of the Debtors and (b) if and to the extent doing so would (1) violate any law to which the Debtors are subject, including any privacy law, (2) result in the disclosure of any trade secrets of third parties in breach of any contract with such third party, (3) violate any legally-binding obligation of any Debtor with respect to confidentiality, non-disclosure or privacy, or (4) jeopardize protections afforded to any Debtor under the attorney-client privilege or the attorney work product doctrine (provided that, in the case of each of clauses (1) through (4), the Debtors shall use commercially reasonable efforts to (x) provide such access as can be provided (or otherwise convey such information regarding the applicable matter as can be conveyed) without violating such privilege, doctrine, contract, obligation or law and (y) provide such information in a manner without violating such privilege, doctrine, contract, obligation or law). Notwithstanding the foregoing, the Debtors reserve the right, in their discretion, to withhold or limit access to any information that the Debtors determine to be sensitive or otherwise not appropriate to disclose to any Prospective Bidder.

The Debtors may terminate access for any Prospective Bidder to the Data Room and any other non-public information in their reasonable discretion at any time, including if (a) a Prospective Bidder fails to become a Qualified Bidder (as defined herein) or (b) these Bid Procedures are terminated. The Prospective Bidder shall return or destroy any non-public information the Debtors or their advisors provided to the Prospective Bidder in accordance with the terms of the confidentiality agreement executed by the Debtors and the Prospective Bidder.

Each Prospective Bidder shall be required to acknowledge that it has had an opportunity to conduct any and all due diligence regarding the Assets in conjunction with submitting its Bid (as defined herein).

All due diligence requests shall be directed to Kroll Securities, LLC, Joshua Benn, joshua.benn@kroll.com.

## IV.    BID DEADLINE

Any Prospective Bidder that intends to participate in the Auction must submit in writing to the Bid Notice Parties a bid (a "Bid") on or before **October 18, 2024, at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").

The Debtors may, in their reasonable judgment, and in consultation with the Consultation Parties, extend the Bid Deadline for all or certain Prospective Bidders; provided, that TREW's written consent is required for any extension beyond the milestones set forth in the DIP Documents (as defined herein).

## V.    BID REQUIREMENTS

### A.  Qualified Bid Requirements

To qualify as a "Qualified Bid," a Bid must be in writing and determined by the Debtors (in consultation with the Consultation Parties) to satisfy the following requirements:

1.   Identification of Bidder. A Qualified Bid must fully disclose the following: (a) the legal identity of each person or entity bidding for the applicable Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such Bid) or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such Bid) the Auction in connection with such Bid and the complete terms of any such participation; and (b) any past or present connections or agreements with the Debtors or their non-Debtor affiliates, TREW, CP7 Warming Bag, L.P., the L Catterton Fund, any other known Prospective Bidder or Qualified Bidder, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtors or their non-Debtor affiliates).

2.   Purchased Assets. A Qualified Bid must expressly identify the following:

   a.   the Assets to be purchased, including the executory contracts and unexpired leases (collectively, the "Assigned Contracts") such Prospective Bidder wishes to acquire.

   b.   the liabilities to be assumed by the Prospective Bidder in the Sale Transaction, including any debt to be assumed and any cure costs to be satisfied by the Prospective Bidder.

3.      Form of Consideration.

    a.      Form of Consideration. Each Qualified Bid must clearly set forth the consideration to be paid for the Assets (the "Purchase Price"), which shall consist solely of cash (or a credit bid, if applicable) and assumed liabilities. Each Qualified Bid must identify the source of such cash consideration, including funding commitments, and confirm that such consideration is not subject to any contingencies. The Purchase Price must include the payment of (i) all allowed cure amounts and all other amounts required to effect the assumption and assignment of any applicable executory contracts and unexpired leases pursuant to Section 365 of the Bankruptcy Code; and (ii) all broker fees or costs or transaction, success, or similar fees due to the Debtors' investment banker upon closing; and (iii) all applicable transfer taxes and costs.

    b.      Allocation. Each Qualified Bid must allocate the Purchase Price amongst the Assets.  For the avoidance of doubt, any such allocation shall not prejudice the rights of any party in interest to contest that allocation.

    c.      Credit Bidding. Notwithstanding anything to the contrary herein, TREW (or its designee) shall be a Qualified Bidder and may, in its sole and absolute discretion, credit bid its Prepetition Obligations, DIP Obligations, or DIP Superpriority Claims, if any (as each term is defined in the DIP Order) (a "Credit Bid"), subject to and in accordance with Section 363(k) of the Bankruptcy Code and the documents or orders governing the postpetition credit provided by TREW to the Debtors (the "DIP Documents"), and such bid shall be a Qualified Bid. TREW shall not be prohibited from making such Credit Bid "for cause" under Section 363(k) of the Bankruptcy Code. TREW shall not be required to provide a Good Faith Deposit (as defined herein).

4.      Proposed Asset Purchase Agreement and Sale Order:

    a.      Proposed Asset Purchase Agreement. Each Qualified Bid must be a binding and irrevocable offer and in the form of an asset purchase agreement that has been approved for use by the Debtors (each, a "Proposed Asset Purchase Agreement") either as (a) a Stalking Horse APA (as defined below) or (b) otherwise provided by the Debtors, in consultation with the Consultation Parties. A Proposed Asset Purchase Agreement must: (a) be duly authorized and executed; (b) be based on, and marked against, the form approved by the Debtors.

       b.    <u>Sale Order</u>. Each Qualified Bid must contain a form of sale order based on, and marked against, the Sale Order (as defined herein) for the applicable Assets to reflect the proposed Sale Transaction and to show any other proposed modifications to the applicable Sale Order.

5.    <u>Ability to Close</u>. A Qualified Bid must include the following:

       a.    a representation that the Prospective Bidder is financially and operationally capable of timely consummating the Sale Transaction contemplated by the Proposed Asset Purchase Agreement;

       b.    sufficient evidence, as reasonably determined by the Debtors (in consultation with the Consultation Parties), to determine that the Prospective Bidder has, or can obtain, the financial wherewithal to timely consummate the Sale Transaction contemplated by the Proposed Asset Purchase Agreement; provided that the Debtors and Consultation Parties—without disclosing the identity of any Prospective Bidder or the amount of any proposed bid—will consult with TREW with respect to the adequacy of any proposed consideration other than cash consideration and will provide TREW with a representation that they have otherwise determined that the Prospective Bidder has, or can obtain, the financial wherewithal to timely consummate the proposed Sale Transaction; and

       c.    Adequate Assurance Information (as defined herein) with respect to any Assigned Contracts that are included or that may be included in the Bid.

6.    <u>Good Faith Deposit</u>. Each Qualified Bid must be accompanied by a good faith deposit (each, a "<u>Good Faith Deposit</u>") in the form of cash (or other form acceptable to the Debtors in consultation with the Consulting Parties and TREW) in an amount equal to 10% of the cash component of the Purchase Price for such Qualified Bid; *provided*, that no Good Faith Deposit shall be required for TREW.

Good Faith Deposits shall be deposited into a trust account maintained on behalf of the Debtors (and to be designated by Debtors) and handled in accordance with these Bid Procedures. To the extent a Qualified Bidder increases the purchase price before, during, or after the Auction, the Debtors (in consultation with the Consultation Parties) reserve the right to require that such Qualified Bidder adjust its Good Faith Deposit so that it equals ten percent (10%) of the increased purchase price. The Debtors reserve the right to increase or decrease the Good Faith Deposit for one or more Qualified Bidders in their sole discretion except with respect to any Qualified Bid from TREW; provided the Debtors may not decrease or waive any Good Faith Deposit without consulting with the Consultation Parties and TREW.

7.      <u>Adequate Assurance</u>. A Qualified Bid must include evidence (the "<u>Adequate Assurance Information</u>") of the Prospective Bidder's (or any other relevant assignee's) ability to comply with Section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Prospective Bidder's (or any other relevant assignee's) ability to cure any defaults existing under or perform future obligations arising under any Assigned Contracts that are included or that may be included in the Bid. The Adequate Assurance Information may include: (i) a corporate organizational chart or similar disclosure identifying corporate ownership and control; (ii) financial statements; (iii) tax returns (iv) annual reports; and (v) summaries of the proposed assignee's experience in the industry, including the number of restaurants currently operating and all trade names used.

The Adequate Assurance Information must be sufficient, as reasonably determined by the Debtors (in consultation with the Consultation Parties), and the Debtors (in consultation with the Consultation Parties) may require any of the foregoing information, or additional information, to be included in any Adequate Assurance Information. All Adequate Assurance Information must be in a form that will permit its immediate dissemination to the applicable counterparties. The Debtors will promptly transmit copies of Adequate Assurance Information to the applicable counterparties.

8.      <u>Representations and Warranties</u>. A Qualified Bid must include the following representations and warranties:

a.      a statement that the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its Bid;

b.      a statement that the Prospective Bidder has relied solely upon its own independent review, investigation and/or inspection of any relevant documents and the Assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Stalking Horse APA;

c.      a statement that all proof of financial ability to consummate the Sale Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and

d.      a statement that the Prospective Bidder agrees to be bound by the terms of the Bid Procedures.

9.      <u>Authorization</u>. A Qualified Bid must: (a) include evidence of authorization and approval from the Prospective Bidder's board of directors (or comparable governing body) with respect to the submission, execution and delivery of any bid for the Assets, participation in the Auction and closing of the Sale Transaction contemplated by the Prospective Bidder's proposed asset purchase agreement; or (b) if the Prospective Bidder is an entity formed for the purpose of effecting the proposed Sale Transaction, a Qualified Bid must provide written evidence acceptable to the Debtors of authorization and the approval by the equity holder(s) of such Prospective Bidder.

10.     <u>Joint Bids</u>. The Debtors may approve joint Bids in their discretion on a case-by-case basis.

11.     <u>Disclosures</u>. A Qualified Bid must identify with particularity each and every condition to closing and all executory contracts and unexpired leases to be assumed and assigned and must include a commitment to close by no later than **<u>October 31, 2024</u>**. A Bid should, but is not required to, propose a contemplated transaction involving all or substantially all of the Assets for either the BurgerFi restaurants or the Anthony's Coal Fired Pizza restaurants.

12.     <u>Other Requirements</u>. A Qualified Bid must:

a.      state that the Prospective Bidder agrees to serve as a backup bidder (a "<u>Backup Bidder</u>") if such bidder's Qualified Bid is selected at the Auction as the next highest or next best bid after the Successful Bid (as defined herein) for the Assets (each such bid, a "<u>Backup Bid</u>");

b.      state that the Bid, as may be modified before or during the Auction, represents a binding, irrevocable, good-faith, and *bona fide* offer to purchase the Assets and is not subject to or conditioned on any due diligence, financing, or other contingency (other than the conditions to closing under the applicable agreement), and is irrevocable until the later of (i) the applicable outside date for consummation of the Sale Transaction or (ii) the Backup Bid Expiration Date (as defined herein);

c.      expressly state and acknowledge that the Prospective Bidder shall not be entitled to a break-up fee, termination fee, expense reimbursement or other "bidding protection" in connection with the submission of a bid for the Assets or otherwise participating in the Auction or the Sale Transaction process, unless otherwise granted

by the Debtors (in consultation with the Consultation Parties) and approved by an order of the Court;

d.   state that the Prospective Bidder is committed to closing the Sale Transaction contemplated in its Bid as soon as practicable and in any case no later than **October 31, 2024**;

e.   specify (i) whether the Qualified Bidder intends to hire any of the Debtors' employees and (ii) the proposed treatment of the Debtors' prepetition compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including offer letters, employment agreements, consulting agreements, retiree benefits, and any other employment related agreements (collectively, the "Employee Obligations");

f.   expressly waive any claim or right to assert any substantial contribution administrative expense claim under Section 503(b) of the Bankruptcy Code or the payment of any broker fees or costs in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the Sale Transaction process;

g.   include a covenant to cooperate with the Debtors (i) to provide pertinent factual information regarding the Prospective Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and any other applicable regulatory requirements and (ii) to obtain Court approval of the Sale Transaction;

h.   state or otherwise estimate the types of transition services, if any, the Prospective Bidder would require of and/or provide to the Debtors, including an estimate of the time any such transition services would be required of and/or provided to the Debtors, if the Prospective Bidder's Bid were selected as the Successful Bid for the applicable Assets;

i.   certify that the Prospective Bidder did not collude with any other bidders and is not otherwise a partnership, joint venture or other entity in which more than one bidder (or any affiliates of a bidder) has a direct or indirect interest, unless consented to in writing by the Debtors (in consultation with the Consultation Parties);

j.   include a covenant to comply with the terms of these Bid Procedures and the Bid Procedures Order; and

k.   include contact information for the specific person(s) the Debtors should contact in the event they have any questions about the Prospective Bidder's bid.

13.    <u>Landlords and Unexpired Leases</u>. A landlord may submit a bid to acquire the Debtors' interests in any unexpired lease to which it is a counterparty. Such bid may include any or all of the outstanding amounts owed under the applicable lease. Such landlord shall be considered a Qualified Bidder as to its unexpired lease(s) without the need to satisfy subsections 4 (other than to submit a binding bid in writing in form and substance reasonably acceptable to the Debtors, in consultation with the Consultation Parties, in their discretion), 5, 6, and 7 of this Section A (Qualified Bid Requirements).

## B. Bid Review Process

The Debtors (in consultation with the Consultation Parties) will review each Bid received to determine whether it meets the requirements set forth above. The Debtors may, as they deem appropriate in their business judgment and in a manner consistent with their fiduciary duties and applicable law, and in consultation with the Consultation Parties, engage with any Prospective Bidder for the purposes of: (i) curing any deficiencies in a Bid that prevents it from constituting a Qualified Bid; (ii) improving the terms of the Bid; or (iii) otherwise promoting a more competitive bidding and Auction process and maximizing the value of the Assets.

The Debtors may (in consultation with the Consultation Parties), among other things: (i) amend or waive the conditions precedent to qualifying as a Qualified Bidder; (ii) extend the Bid Deadline as to any party or with respect to any Assets; (iii) with respect to any Bid that is not a Qualified Bid, the Debtors may provide (but shall not be obligated to provide) the Bidder with the opportunity to remedy any deficiencies prior to the Auction; and/or (iv) postpone or cancel the Auction and terminate the proposed sale(s) for any Assets.

In evaluating a Bid, the Debtors may take into consideration any and all factors that the Debtors deem reasonably pertinent, including, without limitation:

(i)    the amount of the proposed Purchase Price;

(ii)    any Assets and liabilities included in, or excluded from, the Bid, including any executory contracts or unexpired leases;

(iii)    the value to be provided to the Debtors under the Bid, including the net economic effect on the Debtors' estates (taking into account any wind-down expenses, the Debtors' obligations under the DIP Documents, and additional outstanding debt, in each case, as applicable);

(iv)    any benefit to the Debtors' estates from any assumption or waiver of liabilities contemplated by the Bid;

(v)    any benefit to the Debtors' estates arising from the avoidance of additional costs that may be incurred as a result of the Bid;

(vi)    the structure of the proposed Sale Transaction and any attendant execution risk, including conditions to, timing of and certainty of closing, termination provisions,

financing contingencies, availability of financing and general financial wherewithal to meet all commitments, and any required governmental approvals;

(vii)    the impact of the proposed Sale Transaction on employees and the proposed treatment of the Employee Obligations;

(viii)    the impact of the proposed Sale Transaction on the Debtors' trade creditors, licensees, clients and any other parties in interest; and

(ix)    any other factors the Debtors may reasonably deem relevant and consistent with their fiduciary duties.

The Debtors will make a determination regarding the Bids that qualify as Qualified Bids and as Baseline Bids and will notify bidders by **October 19, 2024**, or as soon as practicable thereafter (but prior to the Auction), whether they have been selected as Qualified Bidders. A Qualified Bidder shall not (without the consent of the Debtors), modify, amend or withdraw its Qualified Bid, unless for the purposes of increasing the Purchase Price or otherwise improving the terms of the bid, as determined by the Debtors in their business judgment.

The Debtors, in their business judgment, reserve the right to reject any Bid (other than any Stalking Horse Bid from TREW or Credit Bid from TREW) if such Bid, among other things, (i) is on terms that are more burdensome or conditional than the terms of any Stalking Horse APA; (ii) requires any indemnification of the Prospective Bidder in its asset purchase agreement; (iii) is not received by the Bid Deadline; (iv) is subject to any contingencies (including representations, warranties, covenants, and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the relevant Assets; (v) seeks any bid protections; (vi) does not, in the Debtors' determination, include a fair and adequate Purchase Price; or (vii) the acceptance of which would not be in the best interests of the Debtors' estates.

Any contrary provision hereof notwithstanding, nothing in these Bid Procedures shall modify or extend, or permit the Debtors to modify or extend, the Milestones (as defined in the DIP Documents) without TREW's written consent.

### C. Bidding Protections

The Debtors (in consultation with the Consultation Parties) reserve the right, in their business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with TREW, to designate one or more Bids received in advance of the Bid Deadline as a "Stalking Horse Bid" and such bidder(s) as the "Stalking Horse Bidder" with respect to the applicable Assets, and to designate the asset purchase agreement for such Stalking Horse Bid as the "Stalking Horse APA."

No bidder or any other party (including but not limited to any Stalking Horse Bidder) shall be entitled to any termination or "break-up" fee, expense reimbursement or any other bidding protections in connection with the submission of a bid for the Assets or for otherwise participating in the Auction or the Sale Transaction process, unless otherwise granted by the Debtors and expressly approved by an order of the Court.

## VI.        THE AUCTION

If the Debtors receive more than one Qualified Bid (including any Stalking Horse Bid) for an Asset or combination of Assets, the Debtors will conduct an Auction for such Asset(s). If more than one Qualified Bid exists for acquiring specific combinations of the Assets, then the Debtors may, in the exercise of their reasonable business judgment, first conduct a separate Auction (a "Sub-Auction") for such Assets that have at least one Qualified Bid pursuant to the Bid Procedures.

In the event the Debtors determine not to hold an Auction for some or all of the Assets, the Debtors will file with the Court, and cause to be published on the Claims Agent Website, a notice containing the following information, as applicable: (i) a statement that the Auction for the relevant Assets has been canceled; (ii) the identity of the Successful Bidder; (iii) a copy of the Successful Bid or a summary of the material terms of such Successful Bid, including any assumption and assignment of Contracts contemplated thereby; and (iv) the date, time and location of the applicable Sale Hearing.

The Auction, if required, will be conducted on **October 21, 2024, at 10:00 a.m. (ET)**, in person at Raines Feldman Littrell LLP, 1350 Avenue of the Americas, 22nd Floor, New York, New York 10019; provided, however, the Debtors shall have the right to hold the Auction at a different location, remotely, including telephonically or by other electronic means (including, without limitation, video conferencing) as the Debtors may choose in their discretion (in consultation with the Consultation Parties and with TREW). If held, the Auction proceedings will be transcribed and/or video recorded.

### A.        Participants and Attendees

Only Qualified Bidders are eligible to participate in the Auction or any Sub-Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bid Procedures. At least one (1) day prior to the Auction or any Sub-Auction, each Qualified Bidder must inform the Debtors in writing whether it intends to participate in the Auction. Qualified Bidders participating in the Auction or specific Sub-Auction must appear in person at the Auction or Sub-Auction, as applicable (unless the Auction takes place via Zoom), or through a duly authorized representative. Subject to the Auction procedures set forth in these Bid Procedures, all Qualified Bidders and TREW are permitted to attend the Auction or any Sub-Auction; provided, that the Debtors may, in consultation with the Consultation Parties, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder at the Auction or specific Sub-Auction. Any creditor and its advisors wishing to attend the Auction may do so by contacting, no later than one (1) day prior to the start of the Auction, the Debtors' advisors, and the Debtors shall provide any such person with notice by email of any change to the Auction scheduling.

Each Qualified Bidder participating in the Auction or specific Sub-Auction will be required to confirm in writing and on the record at the Auction or Sub-Auction, as applicable, that (i) it has not engaged in any collusion with respect to the Auction or the submission of any bid for any of the Assets; and (ii) its Qualified Bid that gained the Qualified Bidder admission to participate in the Auction and each Qualified Bid submitted by the Qualified Bidder at the Auction or specific

12

Sub-Auction is a binding, good-faith and *bona fide* offer to purchase the Assets identified in such bids.

All Prospective Bidders and Qualified Bidders (including any Stalking Horse Bidder, Successful Bidder and Backup Bidder) shall be deemed to have: (i) consented to the core jurisdiction of the Court to enter any order related to these Bid Procedures, the Auction or, any other relief requested in the Sale Motion or granted pursuant to the Bid Procedures Order or the construction or enforcement of any agreement or any other document relating to any Sale Transaction; (ii) waived any right to a jury trial in connection with any disputes relating to these Bid Procedures, the Auction or the construction or enforcement of any agreement or any other document relating to any Sale Transaction; and (iii) consented to the entry of a final order or judgment in connection with any disputes relating to these Bid Procedures, the Auction or specific Sub-Auction, the construction or enforcement of any agreement or any other document relating to any Sale Transaction, if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the relevant parties.

## B. Auction Procedures

The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their business judgment, subject to and in accordance with these Bid Procedures:

1. Baseline Bids. Prior to the commencement of the Auction, the Debtors will determine, in their business judgment, the highest and/or best Qualified Bid (each such Qualified Bid, a "Baseline Bid"). Bidding at the Auction shall commence at the amount of the Baseline Bid.

2. Sub-Auctions. The Debtors reserve the right to host Sub-Auctions for Assets at their discretion (each such package an "Auction Package").

3. Minimum Overbid. Any overbid to the initial Baseline Bid at the start of the Auction, and each subsequent bid, shall be in increments of no less than $100,000 for BurgerFi and $250,000.00 for either Anthony's or for both Anthony's and BurgerFi. Bidding at the Auction will begin with the Baseline Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid (a "Subsequent Bid") is submitted by a Qualified Bidder that (i) improves on such Qualified Bidder's immediately prior Qualified Bid and (ii) the Debtors determine is (A) for the first round, a higher or otherwise better offer than the Baseline Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined herein).

   The Debtors will announce at the outset of the Auction the minimum required increments for successive Bids (each, such Bid, a "Minimum Overbid"). The Debtors may, in their discretion, announce increases or reductions to Minimum Overbids at any time during the Auction.

Upon a Qualified Bidder's declaration of a Bid at the Auction, the Qualified Bidder (other than TREW) must state on the record its commitment to pay within two (2) business days following the Auction, if such Bid were to be selected as the Successful Bid or as the Backup Bid, the incremental amount of the Qualified Bidder's Good Faith Deposit calculated based on the increased purchase price of such Bid (such Good Faith Deposit so increased, the "Incremental Deposit Amount") if applicable. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by any Bid subsequent to a Baseline Bid, the Debtors will, at each round of bidding, consider and/or give effect to (a) any additional liabilities to be assumed by a Qualified Bidder under the Bid, including whether such liabilities are secured or unsecured, (b) any additional costs that may be imposed on the Debtors, and (c) the provision of any Wind-Down Expenses, treatment of the Debtors' obligations under the DIP Documents, and any additional outstanding debt, as applicable.

4.    Leading Bid. After the first round of bidding and between each subsequent round of bidding, the Debtors (in consultation with the Consultation Parties) will announce the bid that they believe to be the highest or otherwise best offer (each such bid, a "Leading Bid") and describe the material terms thereof. Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the material terms of the Leading Bid, subject to the Debtors' authority to revise the Auction procedures to the extent permitted hereby.

The Auction or any Sub-Auction will be conducted by open bidding in the presence of all other Qualified Bidders and each Qualified Bidder shall have the right to be present for all rounds of open bidding and to submit additional Bids and make modifications to its Proposed Asset Purchase Agreement at the Auction to improve its Bid. The Debtors may, in their business judgment, engage in discussions and negotiate with any and all Qualified Bidders participating in the Auction or Sub-Auction outside the presence of other bidders before each round of bidding, including to improve or clarify the terms of bids made.

The Debtors shall have the right to determine (in consultation with the Consultation Parties) which Bid is the highest or otherwise best Bid and, in accordance with the terms of these Bid Procedures, reject, at any time, without liability, any bid that the Debtors deem to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, these Bid Procedures, any order of the Court, or the best interests of the Debtors and their estates, taking into consideration, without limitation, the provision of any Wind-Down Expenses, treatment of the Debtors' obligations under the DIP Documents, and any additional outstanding debt, as applicable.

The determination of which Qualified Bid(s) constitutes the Baseline Bid(s) and which Qualified Bid(s) constitutes the Successful Bid(s) shall take into account any factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid(s) to the Debtors' estates, which may include, among other things: (a) the type and amount of Assets sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Baseline Bid; (e) the tax consequences of such Qualified Bid; (f) the assumption of obligations, including contracts and leases; (g) the cure amounts to be paid; and (h) the impact on employees, including the number of employees proposed to be transferred and employee-related obligations to be assumed (collectively, the "<u>Bid Assessment Criteria</u>").

5. <u>Conclusion of Each Overbid Round</u>. Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, and upon consultation with the Consultation Parties, extend from time to time, the "<u>Overbid Round Deadline</u>") by which time any Overbids must be submitted to the Debtors.

6. <u>No Round-Skipping</u>. Round-skipping, as described herein, is explicitly prohibited. To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for the Assets.

7. <u>Announcing Highest Bid</u>. With respect to the Auction, the Debtors shall, subsequent to each Overbid Round Deadline, announce whether the Debtors, in consultation with the Consultation Parties, have identified (a) in the initial Overbid round, an Overbid as being higher or otherwise better than the Baseline Bid in respect of the Assets that are the subject of the Auction or (b) in subsequent rounds, an Overbid as being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated as the Prevailing Highest Bid as well as the value attributable to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

H. <u>Closing the Auction</u>. The Auction shall continue until there is only one Qualified Bid that the Debtors and the Consultation Parties determine to be the highest or otherwise best Qualified Bid for the Assets. Such Qualified Bid shall be declared the "<u>Successful Bid</u>," and such Qualified Bidder, the "<u>Successful Bidder</u>," at which point the Auction will be closed. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance of such Successful Bid is conditioned upon approval by the Court of such Successful Bid. For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Debtors from exercising their fiduciary duties under applicable law. As soon as reasonably practicable after closing the Auction, the Debtors shall finalize definitive documentation to implement the terms of the Successful Bid, and, as applicable, cause such definitive documentation to be filed with the Court.

## C. Auction Results

1.  <u>Successful Bids</u>. Immediately prior to the conclusion of the Auction, the Debtors will notify all Qualified Bidders at the Auction of the identity of the Successful Bidder and the amount of the purchase price and other material terms of the Successful Bid. As a condition to remaining the Successful Bidder, the Successful Bidder shall, within 1 business day of the conclusion of the Auction (i) if applicable, wire to the Debtors in immediately available funds the Incremental Deposit Amount, calculated based on the purchase price in the Successful Bid(s) and (ii) submit to the Debtors fully executed documentation memorializing the terms of the Successful Bid(s).

2.  <u>Backup Bids</u>. Immediately prior to the conclusion of the Auction, the Debtors may (a) determine, in a manner consistent with these Bid Procedures, which Qualified Bid is the Backup Bid and (b) notify all Qualified Bidders at the Auction of the identity of the Backup Bidder and the amount of the purchase price and other material terms of the Backup Bid. The Backup Bidder shall submit to the Debtors execution versions of the documentation memorializing the terms of the Backup Bid(s) within 1 business day of the conclusion of the Auction. Notwithstanding anything to the contrary herein, no Stalking Horse Bid shall be required to serve as a Backup Bid, notwithstanding such Stalking Horse Bid being the next highest or best Bid after a Successful Bid for the Assets, without prior written consent of the Stalking Horse Bidder.

A Backup Bid will remain binding on the applicable Backup Bidder until the first business day after the closing of a Sale Transaction with the Successful Bidder (the "<u>Backup Bid Expiration Date</u>"). If the Sale Transaction with the applicable Successful Bidder is terminated prior to the Backup Bid Expiration Date, the Backup Bidder shall be deemed the new

Successful Bidder and shall be obligated to consummate the Backup Bid as if it were the Successful Bid at the Auction; provided, that the Debtors may, in their business judgment and with notice to such bidder, elect not to pursue the Sale Transaction contemplated by the Backup Bid.

3.     Notice of Auction Results. The Debtors will file with the Court, serve on the Sale Notice Parties by first class mail, and cause to be published on the Claims Agent Website, a notice setting forth the results of the Auction or any Sub-Auction, as promptly as possible after conclusion of the Auction, which notice will (a) identify each Successful Bidder and each Backup Bidder, (b) include a copy of each Successful Bid and each Backup Bid or a summary of the material terms of such bids, including any proposed assumption and assignment of Contracts contemplated thereby, and (c) set forth any applicable objection deadlines and the date, time and location of the Sale Hearing, and any other relevant dates or other information.

4.     The Debtors' presentation to the Court for approval of a selected Qualified Bid as a Successful Bid does not constitute the Debtors' acceptance of such Bid. The Debtors will have accepted a Successful Bid only when such Successful Bid has been approved by the Court at the Sale Hearing.

### D. Additional Auction Procedures

The Debtors (in consultation with the Consultation Parties) may announce at the Auction or a specific Sub-Auction additional procedural rules (e.g., among other things, the amount of time to make Subsequent Bids, the amount of the Minimum Overbid, or the requirement that parties submit "best and final" Bids) for conducting the Auction or specific Sub-Auction or otherwise modify these Bid Procedures; provided, that such rules (i) are not materially inconsistent with the Bid Procedures Order, the DIP Documents, these Bid Procedures, the Bankruptcy Code or any order of the Court; (ii) are disclosed to each Qualified Bidder during the Auction or Sub-Auction; and (iii) are in form and substance acceptable to TREW. For the avoidance of doubt, any Bid for any Assets included in any Auction Package shall be subject to a determination by the Debtors, in their business judgment and in accordance with the other provisions of these Bid Procedures, that (i) a Bid for substantially all of the Debtors' Assets and/or (ii) a combination of Bids that groups the Assets together differently is the highest or otherwise best offer for such Assets.

### E. Disposition of Good Faith Deposit

1.     Prospective Bidders. Within five (5) business days after the Debtors make final determinations as to which Prospective Bidders qualify as Qualified Bidders, a Prospective Bidder's Good Faith Deposit shall be returned to any such Prospective Bidder that did not qualify as a Qualified Bidder, as confirmed by the Debtors. Upon the authorized return of a Prospective Bidder's Good Faith Deposit, the Bid of such Prospective Bidder shall be deemed terminated and no longer binding against the Prospective Bidder.

2.    Qualified Bidders.

a.    <u>Forfeiture of Good Faith Deposit</u>. The Good Faith Deposit of a Qualified Bidder shall be forfeited if the Qualified Bidder attempts to withdraw its Qualified Bid, except as may be permitted by these Bid Procedures, during the time the Qualified Bid remains binding and irrevocable under these Bid Procedures. The Debtors and their estates shall be entitled to retain the Qualified Bidder's Good Faith Deposit as partial compensation for the damages caused to the Debtors and their estates as a result of the Qualified Bidder's failure to adhere to the terms of these Bid Procedures and/or the relevant Qualified Bid. In the event that a Qualified Bidder's Good Faith Deposit is deemed forfeited, such Qualified Bidder's Good Faith Deposit shall be released by wire transfer of immediately available funds to an account designated by the Debtors within two (2) business days after receipt of written notice by an authorized officer of the Debtors stating that the applicable Qualified Bidder has breached or otherwise failed to satisfy its obligations in accordance with these Bid Procedures and the applicable Qualified Bid.

b.    <u>Return of Good Faith Deposit</u>. With the exception of the Good Faith Deposits of Successful Bidders and Backup Bidders and any forfeiture of a Good Faith Deposit as described above, any other Qualified Bidder's Good Faith Deposit shall be returned within five (5) business days after the conclusion of the Auction.

c.    <u>Backup Bidder</u>. Any Backup Bidder's Good Faith Deposit shall be returned within five (5) business days after the occurrence of the Backup Bid Expiration Date.

d.    <u>Successful Bidder</u>. At the closing of a Sale Transaction, the Successful Bidder shall be entitled to a credit against the purchase price for the applicable Assets in the amount of the Successful Bidder's Good Faith Deposit. The Good Faith Deposit of a Successful Bidder shall be forfeited if the Successful Bidder fails to consummate the applicable Sale Transaction because of a breach that entitles the Debtors to terminate the applicable asset purchase agreement with such Successful Bidder, and the Debtors and their estates shall be entitled to retain the Successful Bidder's Good Faith Deposit as partial compensation for the damages caused to the Debtors and their estates as a result of such breach. In the event that a Successful Bidder's Good Faith Deposit is deemed forfeited, such Good Faith Deposit shall be released by wire transfer of immediately available funds to an account designated by the Debtors within two (2) business days after receipt of written notice by an authorized officer of the Debtors stating that the applicable Successful Bidder has breached or otherwise failed to satisfy its

obligations in accordance with these Bid Procedures and the applicable Successful Bid.

## VII.       SALE HEARING

Each Successful Bid (including any Backup Bid that is subsequently deemed a Successful Bid) will be subject to approval by the Court. The hearing to approve any Sale Transaction consummated in accordance with these Bid Procedures (except in the case of a Sale Transaction contemplated by a Backup Bid that subsequently is deemed a Successful Bid) shall take place on **October 25, 2024, at 10:00 a.m. (prevailing Eastern Time)** (the "Sale Hearing") before the Honorable Craig T. Goldblatt, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware.

At the Sale Hearing, the Debtors will seek entry of one or more orders (each, a "Sale Order") approving, among other things, one or more sales of the Assets to the Successful Bidder(s).

Without prejudice to the rights of the any Stalking Horse Bidder under the Stalking Horse APA, the Debtors may, in their business judgment (after consulting with the Successful Bidder(s) and the Consultation Parties), adjourn or reschedule the Sale Hearing, including by announcing such adjournment or rescheduling at the Auction or in Court on the date of the originally scheduled Sale Hearing; provided that TREW's written consent is required for any extension beyond the Milestones set forth in the DIP Documents.

At the Sale Hearing, the Debtors will seek entry of an order that, among other things: (i) authorizes and approves the Sale Transaction(s) to the Successful Bidder(s) and/or the Backup Bidder(s); (ii) includes a finding that the Successful Bidder(s) and/or the Backup Bidder(s) is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code; and (iii) as appropriate, exempts the Sale Transaction(s) and conveyance(s) of the Assets from any transfer tax, stamp tax or similar tax, or deposit under any applicable bulk sales statute.

## VIII.       NOTICING

### A. Bid Notice Parties

Qualified Bids must be submitted in writing to the following parties by email (collectively, the "Bid Notice Parties"):

- the Debtors, c/o Force 10 Partners, jrosenthal@force10partners.com; and nrubin@force10partners.com;

- investment banker for the Debtors, Kroll Securities, LLC, Joshua Benn, joshua.benn@kroll.com; and

- counsel for the Debtors, Raines Feldman Littrell LLP, tfrancella@raineslaw.com, hrafatjoo@raineslaw.com, and dforsh@raineslaw.com.

### B. Sale Notice Parties

The "<u>Sale Notice Parties</u>" shall mean the following persons and entities:

- all persons and entities known by the Debtors to have asserted any lien, claim, interest or encumbrance in the Assets, including TREW;

- all non-Debtor parties to any Contract that may be assumed or rejected in connection with a Sale Transaction;

- any governmental authority known to have a claim against the Debtors in these Chapter 11 Cases;

- the Federal Trade Commission;

- the Bureau of Consumer Protection;

- the Consumer Protection Financial Bureau;

- the Office of the U.S. Trustee for the District of Delaware;

- all applicable federal, state and local taxing authorities, including the Internal Revenue Service;

- the United States Attorney's Office for the District of Delaware;

- United States Attorney General's Office for the District of Delaware;

- the Office of the Attorney General and the Secretary of State in each state in which the Debtors operate;

- counsel for any official committee appointed in these Chapter 11 Cases;

- all of the parties requesting notice pursuant to Bankruptcy Rule 2002; and

- all other parties as directed by the Court.

## IX.    CONSULTATION BY THE DEBTORS

Throughout the Sale Transaction process, the Debtors and their advisors will consult with the following parties (collectively, the "<u>Consultation Parties</u>"), as provided in these Bid Procedures, or as is otherwise necessary or appropriate, as determined in the Debtors' business judgment: (a) the legal and financial advisors for any official committee appointed in these Chapter 11 Cases; and (b) TREW, provided that, if and when TREW submits a Bid (whether on or before the Bid Deadline), TREW will no longer be a Consultation Party.

Notwithstanding the foregoing, the Debtors will not provide copies of any Bids or other confidential information to any Consultation Party or any insider or affiliate of the Debtors if such party is an active or prospective bidder for the relevant Asset(s) at the applicable time. If, however, a member of an official committee appointed in these Chapter 11 Cases submits a Qualified Bid

20

for any of the Assets, the applicable committee will maintain its consultation rights as a Consultation Party, provided, that such committee excludes the bidding committee member from any discussions or deliberations regarding a transaction involving the relevant Assets, and shall not provide any confidential information regarding the Assets or otherwise involving the Sale Transaction process to the bidding committee member.

For the avoidance of doubt, any consultation rights afforded to the Consultation Parties by these Bid Procedures or the Bid Procedures Order shall not in any way limit the Debtors' discretion and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

## X.    RESERVATION OF RIGHTS

The Debtors (in consultation with the Consultation Parties) reserve the right to, in their business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with TREW, modify these Bid Procedures, including to, among other things: (a) extend or waive deadlines or other terms and conditions set forth herein; (b) adopt new rules and procedures for conducting the bidding and Auction process; (c) if applicable, provide reasonable accommodations to any Stalking Horse Bidder; or (d) otherwise modify these Bid Procedures to further promote competitive bidding for and maximizing the of value of the Assets; provided, that such extensions, waivers, new rules and procedures, accommodations and modifications (i) do not conflict with and are not inconsistent with the Bid Procedures Order, the Bid Procedures, the Bankruptcy Code, the DIP Documents, or any other order of the Court, and (ii) are promptly communicated to each Qualified Bidder.

**<u>EXHIBIT 2</u>**

**Notice of the Sale Hearing**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BURGERFI INTERNATIONAL, INC., *et al.*,[1] | Case No. 24-12017 (CTG) |
| Debtors. | (Jointly Administered) |

## NOTICE OF SALE BY AUCTION AND SALE HEARING

    **PLEASE TAKE NOTICE** that on September 20, 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed a motion [Docket No. [•]] (the "Sale Motion")[2] with the United States Bankruptcy Court for the District of Delaware (the "Court") seeking, among other things, entry of an order (the "Sale Order") authorizing and approving: (a) the sale of all or any part of the assets of the Debtors (the "Assets") free and clear of all liens, claims, encumbrances, and other interests (the "Sale"); and (b) the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Contracts").

    **PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers to purchase all or any part of the Assets, in one or more lots and to one or more purchasers, all consistent with the bidding procedures (the "Bid Procedures") approved by the Court by entry of an order on [•] [•], 2024 [Docket No. [•]] (the "Bid Procedures Order"). **All interested bidders should carefully read the Bid Procedures and Bid Procedures Order**. To the extent that there are any inconsistencies between this notice and the Bid Procedures or Bid Procedures Order, the Bid Procedures or Bid Procedures Order, as applicable, shall govern in all respects.

    **PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bid Procedures, the Debtors will conduct an auction (the "Auction") to determine the highest or otherwise best bid for the Assets on **October 21, 2024 at 10:00 a.m. (ET)** at the offices of Raines Feldman Littrell LLP, 1350 Avenue of the Americas, 22nd Floor, New York, NY 10019 (or at any other location or electronically as the Debtors may hereafter designate on reasonable notice).

    **PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale at a hearing scheduled to commence on or before **October 25, 2024, at 10:00 a.m. (ET)** (the "Sale Hearing") before the Honorable Craig T. Goldblatt, United States Bankruptcy Judge for the

---

[1]    The last four digits of the tax identification number of BurgerFi International, Inc. and of Anthony's Pizza Holding Company, LLC are 8815 and 4718, respectively. A list of all Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, is available at https://cases.stretto.com/BFI. The Debtors' mailing address is 200 E Las Olas Blvd., Suite 1400, Fort Lauderdale, FL 33301.

[2]    Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Sale Motion or Bid Procedures Order, as applicable.

Bankruptcy Court for the District of Delaware, 824 North Market Street, 3d Floor, Courtroom 7, Wilmington, DE 19801.

**PLEASE TAKE FURTHER NOTICE** that, except as expressly set forth in the Bid Procedures Order with respect to certain objections that may be raised by counterparties to Contracts, all objections to the relief requested in the Sale Motion **must:** (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served as required by Bankruptcy Rule 2002 and any applicable local rules so as to be **actually received by October 17, 2024**.

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BID PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED TO THE REQUESTED RELIEF, INCLUDING WITH RESPECT TO THE TRANSFER OF THE DEBTORS'ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.**

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Motion, Bid Procedures, and Bid Procedures Order, as well as all additional information concerning these bankruptcy cases, may be obtained free of charge at https://cases.stretto.com/BFI.

*[ remainder of page intentionally left blank ]*

Dated: _____, 2024
Wilmington, Delaware

**RAINES FELDMAN LITTRELL LLP**

_/s/_____

Thomas J. Francella, Jr. (No. 3835)
1200 N. Broom Street
Wilmington, DE 19806
Telephone: (302) 772-5805
Email: tfrancella@raineslaw.com

- and -

Hamid R. Rafatjoo (*pro hac vice*)
Robert S. Marticello (*pro hac vice*)
1900 Avenue of the Stars, 19th Floor
Los Angeles, CA 90067
Telephone: (310) 440-4100
Email: hrafatjoo@raineslaw.com
        rmarticello@raineslaw.com

- and -

Carollynn H.G. Callari (*pro hac vice*)
David S. Forsh (*pro hac vice*)
1350 Avenue of the Americas, 22nd Floor
New York, NY 10019
Telephone: (917) 790-7109
Email: ccallari@raineslaw.com
        dforsh@raineslaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **EXHIBIT 3**

**Assumption and Assignment Notice**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BURGERFI INTERNATIONAL, INC., *et al.*,[1] | Case No. 24-12017 (CTG) |
| Debtors. | (Jointly Administered) |

### NOTICE TO CONTRACT PARTIES TO POTENTIALLY
### ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE OF THE DEBTORS AS SET FORTH ON EXHIBIT A ATTACHED HERETO**

**PLEASE TAKE NOTICE** that on [•] [•], 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order approving a process and procedures for the sale of all or any part of the assets of the Debtors (the "Assets") in one or more lots and to one or more purchasers [Docket No. [•]] (the "Bid Procedures Order").[2] The bidding process and any related auction (the "Auction") will be governed by the procedures approved pursuant to the Bid Procedures Order (attached as Exhibit 1 to the Bid Procedures Order, the "Bid Procedures").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bid Procedures and subject to entry of an order of the Court approving a Sale, the Debtors **may** assume and assign to the Successful Bidder the contracts or agreements listed on **Exhibit A** (the "**Assigned Contracts**"), including but not limited to those Assigned Contracts to which you are a counterparty.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have conducted a review of their books and records and have determined that the amount necessary to cure all unpaid obligations or defaults (if any) under each Assigned Contract is as set forth on **Exhibit A** attached hereto (the "Cure Amounts").

**PLEASE TAKE FURTHER NOTICE** that if you (i) disagree with the proposed Cure Amount for any Assigned Contract, or (ii) object to the assumption and assignment of any

---

[1] The last four digits of the tax identification number of BurgerFi International, Inc. and of Anthony's Pizza Holding Company, LLC are 8815 and 4718, respectively. A list of all Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, is available at https://cases.stretto.com/BFI. The Debtors' mailing address is 200 E Las Olas Blvd., Suite 1400, Fort Lauderdale, FL 33301.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bid Procedures Order or the Bidding Procedures, as applicable.

Assigned Contract for any reason not related to the identity of the Successful Bidder, then you must file an objection with the Court no later than **October 17, 2024**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will mail you certain information concerning the potential assignees of the Assigned Contracts, including but not limited to information relating to the ability of such parties to perform under the Assigned Contracts in the future, on or before October 20, 2024. The Debtors will also provide this information by email on or before October 20, 2024 to any counterparty to an Assigned Contract (or counsel thereto) who submits a request by email no later than **October 17, 2024** to the undersigned counsel, with a subject line "Request for Adequate Assurance" and expressly identifying the Assigned Contracts of that counterparty.

**PLEASE TAKE FURTHER NOTICE** that you must file any objection related to the identity of the Successful Bidder, including but not limited to adequate assurance of future performance by the Successful Bidder, no later than **October 24, 2024 at 10:00 a.m. (ET)**.

**PLEASE TAKE FURTHER NOTICE** that any objection filed must (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amounts, state the correct cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served so as to be actually received by the applicable deadline.

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Amounts(s), (b) the proposed assignment and assumption of any Assigned Contract, or (c) adequate assurance of the Successful Bidder's ability to perform is filed by the Contract Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Amounts as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the proposed Assigned Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of an Assigned Contract or related Cure Amounts in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing shall be heard at a later date as may be fixed by the Court.

**PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Assigned Contract on the Cure Notice does not require or guarantee that such Assigned Contract will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Assigned Contract are reserved. Moreover, the Debtors explicitly reserve their rights to seek to reject or assume each Assigned Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the

procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Assigned Contract as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Assigned Contracts or the validity, priority, or amount of any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bid Procedures, Bid Procedures Order, as well as all other pleadings in and additional information concerning these bankruptcy cases, may be obtained free of charge at https://cases.stretto.com/BFI/.

Dated: _____, 2024  
        Wilmington, Delaware

**RAINES FELDMAN LITTRELL LLP**

/s/ _____  
Thomas J. Francella, Jr. (No. 3835)  
1200 N. Broom Street  
Wilmington, DE 19806  
Telephone: (302) 772-5805  
Email: tfrancella@raineslaw.com

- and -

Hamid R. Rafatjoo (*pro hac vice*)  
Robert S. Marticello (*pro hac vice*)  
1900 Avenue of the Stars, 19th Floor  
Los Angeles, CA 90067  
Telephone: (310) 440-4100  
Email: hrafatjoo@raineslaw.com  
      rmarticello@raineslaw.com

- and -

Carollynn H.G. Callari (*pro hac vice*)  
David S. Forsh (*pro hac vice*)  
1350 Avenue of the Americas, 22nd Floor  
New York, NY 10019  
Telephone: (917) 790-7109  
Email: ccallari@raineslaw.com  
      dforsh@raineslaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## EXHIBIT B

**Proposed Sale Order**

**( to be filed separately )**