# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BURGERFI INTERNATIONAL INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12017 (CTG)<br>(Jointly Administered)<br><br>**Related Docket No. 1927** |

## MEMORANDUM OPINION

This is a case in which it appears that the parties documented their various agreements based on a shared set of assumptions. In two respects, however, those assumptions turned out to be incorrect. The dispute is over how the relevant agreements should be construed in light of the fact that events have unfolded somewhat differently than the parties had expected when the agreements were signed. The answer is that when the language of the agreements is clear and unambiguous, that language must be given effect. But when the language, if read in a vacuum, might be amenable to more than one construction, the context of the agreements – here, the backdrop of the parties' underlying legal rights and obligations against which these agreements were written – may clarify an ambiguity.

The *first* assumption of the parties that turned out to be incorrect is that the liquidating trust has incurred expenses that were greater than expected in the claims resolution process. That, in turn, has given rise to a dispute over the relative rights of the trust and the prepetition secured creditor (who is also the DIP lender and the buyer) over how the plan addresses the distribution of assets that

come into the trust after the effective date (here, various unearned insurance premiums that are being returned).  The *second* is that the debtors spent about $120,000 less than the parties had budgeted in the period between the closing of the sale of the debtors' assets and the effective date of the plan.  The liquidating trust and the DIP lender dispute which party is entitled to those funds.

For the reasons described below, the Court concludes that the unambiguous text of the plan provides that the assets that come into the estate after the effective date (including the unearned insurance premiums) are subject to the plan's term stating that the liquidating trust's expenses must be paid or reserved for before the funds flow through to the secured creditor.  The Court rejects, however, the liquidating trust's contention that the plan subordinates the secured creditor's recovery on account of its collateral until unsecured creditors receive $350,000 in distributions.  With respect to the $120,000 of cash, however, the language and context of the agreement make clear that these funds are collateral that secures remaining obligations under the DIP loan, including various lender fees.

## Factual and Procedural Background

The debtors in these bankruptcy cases were the owners, operators, and franchisors of two restaurant chains – BurgerFi and Anthony's Coal Fired Pizza & Wings.  The basic trajectory of these bankruptcy cases was a common one in modern chapter 11 practice.  The debtors filed these bankruptcy cases in September 2024, owing approximately $75 million to groups of secured creditors – approximately $60

million to TREW, their senior lender, and additional $15 million to a junior lender.[1] The debtors had marketed their businesses prepetition and filed for bankruptcy seeking to complete a sale process.

TREW agreed to provide a debtor-in-possession loan to finance an expedited bankruptcy process under which it intended to acquire the debtors' businesses by credit bidding its prepetition and DIP loans.  Beginning after the formation of the Committee and running through a "second-day" hearing (which was pushed back for a week while the parties negotiated), the debtors, the Committee, and TREW agreed to a slightly longer process that would be funded by a slightly larger DIP loan than originally proposed.  In the end, the Court approved a DIP loan of approximately $6.75 million in new money and a sales process that would run through a sale hearing in early November – about 60 days after the petition date.

In response to objections by the landlords raised at the second-day hearing that the budget was insufficient to allow the debtors to pay rent during the extended sale process, the Court made the customary observation about the need for a secured lender to "pay the freight" for a bankruptcy process being run principally to maximize the value of its collateral.  "[T]o the extent we're going to run a bankruptcy process, the net result of which may be that, subject to … reasonable

---

[1] D.I. 21 ¶¶ 14-19; D.I. 1348-1 at 2-3.  TREW Capital Management Private Credit 2, LLC is referred to as "TREW."  The junior lender was CP7 Warming Bag, L.P., an affiliate of L. Catterton Fund.  The Court relies on these facts as set forth in the first-day declaration (D.I. 21) and the combined plan and disclosure statement (D.I. 1348-1) solely by way of background.  As further described below, the Court resolves this motion based solely on the language of the relevant agreements and orders, and basic set of stipulated facts that were read into the record and are attached hereto as Exhibit A.

procedures and an auction, the secured creditor is going to take its collateral, that's fine. What it can't do is leave administrative creditors on the hook."[2]

Ultimately, the debtors, the Committee, and TREW agreed to a budget that the parties believed sufficient to pay administrative expenses until the closing of the asset sales, with cash left behind to fund the plan process. The agreement further contemplated that TREW (if it were the winning bidder) would contribute $250,000 to fund the post-confirmation trust. The parties agreed that the buyer (whether TREW or another winning bidder) would be responsible for the costs associated with operating the businesses upon and after the closing of the sale. The parties also agreed that certain estate causes of action would be contributed to the post-confirmation trust, and they agreed on a formula for sharing the proceeds of any recoveries on those causes of action between general unsecured creditors and TREW, which would recover its share of those proceeds (40 percent of recoveries after other unsecured creditors receive distributions of $350,000) until its deficiency claim was paid in full.[3]

The bankruptcy process appears to have operated as intended, with competitive auctions taking place for the assets related to both the BurgerFi business and the Anthony's Coal Fired Pizza business.[4] TREW, however, emerged as the successful bidder for both businesses – acquiring the BurgerFi assets for a

---

[2] Oct. 15, 2024 Hr'g Tr. at 44 (edited slightly to translate the Court's gibberish into more standard English).

[3] *Id.* at 11-12.

[4] D.I. 1348-1 at 5-6.

credit bid of $10 million and the Anthony's Coal Fired Pizza business for a credit bid of $44 million.  Both sales were approved by the Court and closed in November 2024.[5]  The Court confirmed a plan, which was broadly consistent with the agreement described by the parties at the October 2024 second-day hearing, in March 2025.[6]

Following confirmation, a dispute arose between TREW and the post-confirmation trust over the parties' rights with respect to (a) certain unearned insurance premiums (in the amount of approximately $885,000) that were paid by the debtors and that the estates are entitled to have refunded; and (b) approximately $120,000 in cash that was reserved for wind down expenses but, because the parties had budgeted conservatively, not paid.  The liquidating trustee moved that the confirmed plan be "clarified" to make clear these amounts are the property of the liquidating trust.[7]

This dispute is primarily about the terms of various court-approved agreements: the DIP loan, the asset purchase agreements, and the plan.  As noted above, the linchpin of this bankruptcy case was a settlement among the debtors, the Committee, and TREW that was announced at the second-day hearing and ultimately documented in the confirmed plan.  And so, while there is a sense in

---

[5] *See* D.I. 310, 311 (sale approval orders); D.I. 1348-1 at 5-6 (describing sale process).

[6] D.I. 1365.

[7] D.I. 1927.

which this is out of chronological order, the logical place to begin in reviewing the relevant documents may well be with the terms of the plan.[8]

### 1.    Plan provisions

The basic mechanic of the plan was the establishment of a liquidating trust, which took on responsibility for making distributions in accordance with the plan. Section 9.1(f) makes clear that the administrative expenses of the trust must be paid or reserved for before any other distributions are made.  That section provides:

> From and after the Effective Date, the Liquidating Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the Liquidating Trust Expenses.  The Liquidating Trust Expenses shall be payable solely from Liquidating Trust Assets in accordance with the Plan and the Liquidating Trust Agreement.  The Liquidating Trustee may, but shall not be obligated to, physically segregate and maintain separate accounts or sub-accounts for Liquidating Trust Expenses.  Reserves may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, to enable the Liquidating Trustee to determine reserves and amounts to be paid to Holders of Allowed Claims.  *For the avoidance of doubt, the Liquidating Trust shall pay or reserve for all Liquidating Trust Expenses before a Distribution may be made from Liquidating Trust Assets.*[9]

Once those expenses are paid (or reserved for), the liquidating trust then makes distributions in accordance with the plan.  The plan envisioned that administrative expenses and other priority claims would be paid out of cash the debtors were holding on the effective date of the plan, with the balance paid to TREW in satisfaction of its secured claim.  The plan thus provides that on "the Effective Date, all cash held by the Debtors (excluding the [$250,000] TREW Cash

---

[8] The plan is docketed at D.I. 1348.

[9] D.I. 1348 § 9.1(f) (emphasis added).

Contribution) after payment of or reserve for Allowed Administrative Claims, Priority Tax Claims, or Priority Non-Tax Claims shall be paid to TREW."[10]    Cash the trust might thereafter receive would be distributed in accordance with the plan. One key provision of that plan is an agreed "waterfall" that reflects the settlement among TREW, the Committee, and the debtors.    The precise operation of this provision is disputed as addressed in greater detail below.    The language of the operative provision, however, states that:

> Notwithstanding anything to the contrary herein, all Distributions on account of Allowed Claims in Class 3 (TREW Claims), Class 4 (CP7 Claims), Class 5 (BFI Claims) and Class 6 (ACFP Claims) shall be subject to the following allocation (the "Waterfall"):
>
> (a) The Liquidating Trust shall not make any Distributions of Cash to TREW on account of Class 3 Claims (TREW Claims) unless and until $350,000 of Distributions (the "Initial Distribution") in the aggregate has been made on account of Allowed Claims across Class 4 (CP7 Claims) [the junior secured lender, whose lien was wholly underwater and thus treated as unsecured and subordinated to TREW], Class 5 (BFI Claims) [unsecured claims against the BurgerFi entities], and Class 6 (ACFP Claims) [unsecured claims against the Anthony's Coal Fired Pizza entities].
>
> (b) After the Initial Distribution, all Distributions of Liquidating Trust Assets shall be made in accordance with the Plan; provided, however, that any recoveries or proceeds on any Retained Causes of Action obtained by the Liquidating Trust shall be allocated, on a dollar-by-dollar basis, 40% for Distributions on Class 3 (TREW Claims), and 60% for Distributions on all other Allowed Claims in their proper order of priority and in accordance with Article VI of the Plan [which addresses the allocation of value among unsecured creditors].    For the avoidance of doubt, except for the allocation of such recoveries or proceeds as between Class 3 and other General Unsecured Claims as set forth in the foregoing sentence, Distributions shall only be made in such

---

[10] *Id.* § 6.4(b)(i)(1).

amounts and at times deemed reasonably prudent by the Liquidating Trustee, in its discretion.

(c) For the avoidance of doubt, all Distributions on account of Class 4 (CP7 Claims) shall be subject to Section 6.5(b)(ii) of the Plan [which provides for the subordination of those claims to the TREW claims].[11]

The parties dispute whether either the approximately $880,000 it expects to receive or the $120,000 in cash the trust is holding is even subject to this distribution mechanic.  As will be described in further detail below, TREW contends that the $880,000 is its collateral under the prepetition loan and should be paid over to it under § 6.4(b)(i)(2) of the Plan.  TREW further contends that the $120,000 is its cash collateral that should be paid to it under the DIP loan.

Those disputes turn out to be significant because (as described by counsel to the liquidating trust during the September 8, 2025 hearing) the trust has run into unanticipated complications in resolving administrative and priority claims.  It therefore turns out to be important whether these funds (a) are Liquidating Trust Assets that are subject to § 9.1(f) of the plan and (b) whether they are subject to the distribution scheme set forth in § 10.3.

## 2.    The asset purchase agreements

TREW's principal contention is that the unearned insurance premiums were assets that they purchased from the debtors when they acquired the assets of the BurgerFi and Anthony's Coal Fired Pizza entities, and that those assets therefore do not belong to the liquidating trust.  The relevant language of the asset purchase agreements defined the "purchased assets" to be, in relevant part:

---

[11] *Id.* § 10.3.

[A]ll or substantially all of the Sellers' assets used or held for use in the Business (other than the Excluded Assets) … including …:

(g) all claims related to the Purchased Assets (including property claims) under insurance policies, the Assumed Liabilities, or operation of the Business; to the extent set forth in Section 7.6(a), all rights and proceeds of any Condemnation proceeding affecting the Purchased Assets; and all guarantees, representations, warranties, and indemnities and proceeds thereof, and related rights against third parties, arising with respect to the Purchased Assets or any Assumed Liabilities or associated with the operation of the Business.[12]

The agreement further goes on to define "Excluded Assets" to mean:

(c) security deposits and all credits, prepaid expenses, deferred charges, advance payments, or refunds to the extent not related to a Purchased Asset, which, for the avoidance of doubt, includes unearned or refunded insurance policy premiums, utility escrow and deposits made post-petition for the purpose of bankruptcy adequate protection.[13]

### 3.    The DIP budget

The dispute over the approximately $120,000 in cash requires an examination of the way in which these cases were financed.  To begin, consistent with the pay-the-freight principle described above, § 2.1(b) of the asset purchase agreements provides that the buyer acquired the debtors' cash, except for the cash that the parties agreed would be necessary to fund the bankruptcy process from the closing of the sale through the effective date of the plan.  Specifically, § 2.1(b) of the asset purchase agreement includes, in the definition of "Purchased Assets," "all

---

[12] D.I. 311-1 § 2.1.  This citation is from the Asset Purchase Agreement with respect to the assets related to the BurgerFi business.  The Asset Purchase Agreement with respect to the Anthony's Coal Fired Pizza business is docketed at D.I. 310-1.  Because no party suggests that any of the relevant provisions is different as between the two asset purchase agreements, solely for the sake of convenience the Court will point only to the BurgerFi Asset Purchase Agreement language.

[13] D.I. 311-1 § 2.2.

accounts at banks or other financial institutions that are listed on Schedule 2.1(b); minus the remaining cash in such accounts listed on Schedule 2.1(b) as of the Closing Date, which Sellers will sweep on the Closing Date to first fund the DIP Budget then return the unused cash to the DIP Lender."[14]  To that end, the parties filed a cash collateral budget, after the closing of the sale, that provided that the debtors would retain approximately $800,000 of cash collateral to reserve for the remaining administrative obligations through the plan's effective date.[15]

As it turns out, however, the budget was a conservative one, and approximately $120,000 in cash remained in the accounts when the plan became effective.  TREW contends that this amount is its cash collateral under the DIP loan, and that it is now entitled to that cash.  The liquidating trust counters that the DIP loan was fully repaid via the lenders' credit bidding the DIP to acquire the debtors' assets, and that the liquidating trust is accordingly entitled to those funds.  Relatedly the DIP loan itself provides that the debtors were responsible for the payment of the lender's fees.  TREW has submitted invoices to the liquidating trust seeking the payment of approximately $195,000 in such fees.

## Jurisdiction

The relief sought in the motion is primarily an order that would clarify and/or enforce the confirmed plan of reorganization.  A court's jurisdiction to enforce or interpret its prior orders, and to enforce the terms of a confirmed plan, is well

---

[14] *Id.* § 2.1(b) (including, in the definition).

[15] D.I. 873.

established and grounded in 28 U.S.C. § 1334(b).[16] This matter was referred by the district court to this Court under 28 U.S.C. § 157(a) and the district court's February 29, 2012 standing order of reference. Because it relates to the plan confirmation order, the DIP financing order, and the order approving the sales of the debtors' assets, this is a core matter under 28 U.S.C. § 157(b)(2)(D), (L), and (N).

## Analysis

There is no dispute that each of the documents at issue, including the confirmed plan, is to be construed in accordance with ordinary contract principles.[17] The plan here provides that it is to be governed by Delaware law, which follows customary principles of contract construction. One starts with the language of the documents. Where that language is clear and unambiguous, the plain meaning is to be given effect.[18] Delaware law also recognizes, however, that the commercial context of an agreement can inform its meaning. "A reading of an agreement must be reasonable when the contract is read in full and situated in the commercial context between the parties. The basic business relationship between the parties must be understood to give sensible life to any contract."[19] This point reflects the

---

[16] *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *In re Essar Steel Minnesota LLC*, 47 F.4th 193, 197 (3d Cir. 2022).

[17] *See In re Shenango Group Inc.*, 501 F.3d 338, 344 (3d Cir. 2007) ("In construing a confirmed plan of reorganization, we apply contract principles.")

[18] *See Thompson Street Capital Partners IV, L.P. v. Sonova United States Hearing Instruments, LLC*, 340 A.3d 1151, 1166 (Del. 2025).

[19] *See Florida Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1080 (Del. Ch. 2021) (citation, internal quotations, and brackets omitted).

more general principle, set forth in the *Restatement*, that "[m]eaning is inevitably dependent on context."[20]

The relevant context here is that, before the bankruptcy filing, TREW held first liens on substantially all of the debtors' assets.  And the value of those assets turned out (after a competitive auction) to be less than the debt owed to TREW.  TREW supported and financed the bankruptcy case, presumably because it concluded that it would obtain greater value for its collateral by buying it at a bankruptcy auction (in which it could credit bid its secured claims) than it could by foreclosing outside of bankruptcy.  It is now well established, however, that to the extent a secured creditor seeks these benefits of the bankruptcy process, it must ensure that the debtor has the wherewithal to run an appropriate process that is calculated to yield the highest and best offer available for the debtor's assets, and to do so without leaving an administratively insolvent estate that leaves post-petition creditors bearing the cost of the process.[21]

Assuming it does so, however, the background principle is that the secured creditor is entitled to the proceeds that are properly attributable to the value of its

---

[20] *Restatement of Contracts (Second)* § 202 cmt. d.  *See also id.* § 220 (addressing the role of "usage" in construing contractual language, and noting (in comment b) that where "a usage of words is sufficiently well known, a court will take judicial cognizance of it without proof").

[21] *In re Townsends, Inc.,* Bankr. D. Del. No. 10-14092 (CSS), Jan. 21, 2011 Hr'g Tr. at 24 ("[it] can't be done on the back of the ... admin claims. Congress has made that determination").  *See also In re Silver Airways LLC*, 671 B.R. 533, 542 (Bankr. S.D. Fla. 2025) ("A secured creditor that chooses to avail itself of the protections and powers of Chapter 11 ... including the ability to sell its collateral free and clear under § 363(f) [and/or] to provide DIP financing under § 364 ... must also accept the obligations that come with that choice.  Chief among them is the requirement that the estate's administrative expenses be paid.")

collateral, up until its debt is paid in full.[22]  It is, to be sure, not uncommon for plans under which secured creditors receive less than payment in full to provide for some distribution to junior creditors.  In some cases, there may be value that is properly attributable to assets that are outside the secured creditor's collateral base.  In others, unsecured creditors may have an argument that the secured creditor's liens are subject to avoidance, and the parties agree to settle such a dispute by allocating some value to unsecured creditors.

Here, the language of the plan, consistent with the settlement announced at the second-day hearing, comports with this commercial context.  While TREW acquired substantially all of the assets of the BurgerFi and Anthony's Coal Fired Pizza businesses, it also (a) financed the cost of the bankruptcy cases through the DIP loan; (b) left cash in the debtors after the closing of the sale to permit the completion of the plan process; (c) funded the post-confirmation trust with $250,000, and (d) agreed to a sharing of the proceeds of estate causes of action and to a subordination of at least certain of its own recoveries to the claims of unsecured creditors.  This commercial context informs the reading of the controlling language itself.

---

[22] *See generally* 11 U.S.C. §§ 506(a), 1129(b)(2)(A); *In re Murel Holding Corp.,* 75 F.2d 941, 942 (2d Cir. 1935).

I.    **The unearned insurance premiums are Liquidating Trust Assets that are subject to § 9.1(f) of the plan; the premiums are not, however, subject to § 10.3's subordination provision.**

With respect to the unearned insurance premiums, the language of the documents, particularly when read in context, makes clear that these *assets* were *excluded* from the asset purchase.  As such, they are "Liquidating Trust Assets" as that term is used in the plan.

TREW argues that the premiums were included in what it purchased in the asset sales because they fit within the definition of "purchased assets" set forth in § 2.1(g).  And while an argument can be made that the premiums would fit within some of the broader language of that section, there is no question these insurance premiums are specifically identified in the "excluded assets" provision in § 2.2, which provides that "for the avoidance of doubt … unearned or refunded insurance policy premiums" are "excluded assets".[23]  This more specific provision necessarily prevails over the more general description of the "purchased assets."[24]  As such, the unearned insurance premiums were not purchased by TREW.  Accordingly, these premiums became trust property as "Liquidating Trust Assets," as that term is

---

[23] D.I. 311-1 § 2.2.

[24] *See generally DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").  The asset purchase agreement, like the plan, provides that it is to be construed in accordance with Delaware law.  *See* D.I. 311-1 § 13.5.

defined in the plan.[25]   The proceeds of these unearned insurance premiums are accordingly subject to being distributed in accordance with the plan.

A.   **The administrative costs of the liquidating trust must be paid or reserved for before any payment is made out of Liquidating Trust Assets.**

The distribution of Liquidating Trust Assets is provided for in the plan. There, TREW's position is that because the unearned insurance premiums were subject to its prepetition security interest, it receives the proceeds of that collateral without regard to whether the administrative expenses of the trust are paid or reserved for.  The text of the plan, however, says otherwise.

To be sure, § 6.4(b) distinguishes between distributions that TREW receives on account of the proceeds of its collateral (described in § 6.4(b)(i)) and the distribution it receives on account of its deficiency claim (described in § 6.4(b)(ii)). And § 6.4(b)(i), consistent with the proposition that these assets were "excluded assets" under the asset purchase agreement, states that "[i]f recovered by the Debtors or the Liquidating Trust … all refunds or returns of unearned premiums on

---

[25] The plan defines Liquidating Trust Assets to mean: "(I) all property, rights or other assets of the Debtors and the Estates of any kind or nature, whether existing as of the Effective Date or arising thereafter, wherever located and whether tangible or intangible, including without limitation (a) all of the Debtors' Cash; (b) all Retained Causes of Action; (c) all rights of setoff, recoupment, and other defenses against Claims; (d) all of the Debtors' rights under the Asset Purchase Agreements and any other documents related to the Sales; (e) all of the Debtors' bank accounts; (f) all documents, communications and information of the Debtors, without regard to whether such documents, communications and information are subject to the attorney-client privilege not transferred as part of the Sales; (g) all BF Parent Assets; (h) all BFI Assets; (i) all ACFP Assets; (j) the New Parent Equity; and (k) any other assets, and any proceeds realized or received from such assets, of the Debtors or their Estates that were not sold pursuant to the Sale Orders, if any, existing immediately prior to the Plan becoming effective; and (II) the TREW Cash Contribution and the TREW Litigation Contribution."  D.I. 1348-1 at A-9-10.

insurance policies that have been canceled, rejected or terminated by the Debtors, shall be paid to TREW."[26]

While that is true, nothing in § 6.4(b)(i) purports to override the provisions of § 9.1(f).  Section 9.1(f) makes clear the trust is not to make *any* payment out of Liquidating Trust Assets unless and until the trust's administrative expenses have been paid or reserved for.  And nothing in § 6.4(b)(i) of the plan, no matter how broadly read, would exempt the unearned insurance premiums from being Liquidating Trust Assets.  The Court accordingly concludes that the proceeds of the unearned insurance premiums should be used to pay the liquidating trust's administrative expenses *before* those funds flow through to be distributed in accordance with otherwise applicable provisions of the plan.

### B.    Read in context, § 10.3 of the plan does not provide that all distributions to TREW are subordinated to the $350,000 Initial Distribution.

Based on the text of the plan alone, the liquidating trust also has a reasonable argument that not only do the administrative costs of the trust come ahead of the payment of TREW's secured claim, but so does the making of the "Initial Distribution" of $350,000 to the holders of claims in Classes 4, 5, and 6 (which are general unsecured claims *other than* TREW's deficiency claim).  And

---

[26] D.I. 1348 § 6.4(b)(i)(2).  While TREW contends that this plan provision supports its contention that the unearned premiums were a purchased asset, that argument does not withstand scrutiny.  TREW received the purchased assets on account of its credit bid.  Section 6.4 of the plan addresses TREW's distribution on account of the claim that it held against the estate *after* its credit bid.  The fact that the plan contemplates that TREW would receive the insurance premiums on account of its secured claim thus supports the conclusion that the premiums were excluded from the purchase and became "Liquidating Trust Assets" to be distributed under the plan.

while the notion that the return of collateral should be subordinated to payment of unsecured claims may be a commercially surprising one, the argument does find support in the way that § 10.3 of the plan is written.

This Court begins with the premise that courts ought to hold well-represented parties to the language of their agreements. Judge Easterbrook's opinion in *Kham & Nate's Shoes No. 2* famously warns against the risks associated with courts re-writing parties' agreements to fit the court's own sense of what is "equitable." There, the court declined to "embrace a rule that requires participants in commercial transactions not only to keep their contracts but also do 'more' – just how much more resting in the discretion of a bankruptcy judge assessing the situation years later."[27] Rather, contracts "specify the duties of the parties to each other, and each may exercise the privileges it obtained."[28] Once courts begin to alter parties' negotiated terms to fit a judge's own vision of what is commercially appropriate, they have charted a course towards chaos. "Unless pacts are enforced according to their terms, the institution of contract, with all the advantages private negotiation and agreement brings, is jeopardized."[29]

At the same time, everyone acknowledges that there is some limit to this principle. No one contends that a typographical mistake or a "scrivener's error" in

---

[27] *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir. 1990).

[28] *Id.*

[29] *Id.*

an agreement should be literally enforced.[30]  And there are also cases, like this one, in which documents have provisions that simply conflict with one another.  When that occurs, it is not terribly helpful to say that courts should "enforce the agreement."  Rather, one must carefully parse through the various provisions, in light of the overall context, to decide what the agreement actually provides.

The specific issue is whether TREW's right to a distribution on account of its *secured* claim is subordinated to creditors in Classes 4, 5, and 6 collectively receiving $350,000 on account of their *unsecured* claims.  As noted above, that may on its face appear to make rather little sense as a commercial matter.  The difficulty for TREW, however, is that Section 10.3(a) says flatly that the "Liquidating Trust shall not make any Distributions of Cash to TREW on account of Class 3 Claims (TREW Claims) unless and until $350,000 of Distributions (the "Initial Distribution") in the aggregate has been made on account of [claims of unsecured creditors in Classes 4, 5, and 6]."[31]

TREW's response to that argument is to say that when § 10.3(a) refers to TREW's "Class 3 claims," it is referring to TREW's deficiency claim, not its secured claim.  The problem with this response, however, is that § 6.4(a) says that "Class 3 consists of *all* TREW Claims."[32]   Read literally, that language would seem to

---

[30] *See generally Nash v. Kornblum,* 186 N.E.2d 551 (N.Y. 1962).

[31] D.I. 1348 § 10.3(a).

[32] *Id.* § 6.3(a) (emphasis added).

suggest that all of TREW's Class 3 claims are subordinated to creditors in Classes 4, 5, and 6 recovering $350,000 on their unsecured claims.

TREW, however, has two textual responses to this language.  The *first* is based on the language of § 10.3(b).  That provision explains that the distribution made on account of "any recoveries or proceeds on any Retained Causes of Action obtained by the Liquidating Trust shall be allocated, on a dollar-by-dollar basis, 40% for Distributions on Class 3 (TREW Claims), and 60% for Distributions on all *other* Allowed Claims in their proper order of priority and in accordance with Article VI of the Plan."[33]  This use of the term "other" in § 10.3(b) could be read to suggest, as TREW argues, that the subordination is limited to TREW's deficiency claim (which is unsecured) and does not apply to the return of its collateral in satisfaction of its secured claims.  And while it certainly bears note that the use of the word "other" is in § 10.3(b) while the subordination provision is in § 10.3(a), it does stand to reason that the term "Class 3 (TREW Claims)" would have the same meaning when used in these two adjacent subsections of the plan.

TREW's *second* textual argument relies on § 6.4(b)(ii).  Here, in describing TREW's deficiency claim, the plan goes out of its way to state that "[n]otwithstanding anything to the contrary herein or in the Liquidating Trust Agreement, all Distributions to TREW *on account of its Deficiency Claim* shall be

---

[33] *Id*. § 10.3(b) (emphasis added).  *See also id.* ("For the avoidance of doubt, except for the allocation of such recoveries or proceeds as between Class 3 and *other* General Unsecured Claims as set forth in the foregoing sentence, Distributions shall only be made in such amounts and at times deemed reasonably prudent by the Liquidating Trustee, in its discretion.") (emphasis added).

subject to the Waterfall."[34]   That "Waterfall" is the provision of § 10.3, which includes the $350,000 subordination.   There is no such statement in § 6.4(b)(i) with respect to TREW's secured claim.   So, a negative inference can certainly be drawn from the inclusion of this sentence in § 6.4(b)(ii) that the secured claim addressed in § 6.4(b)(i) is *not* subject to the Waterfall provided in § 10.3.

In light of these conflicting provisions, the only fair conclusion is that answer to the question cannot be derived from the text alone.   To resolve these internal tensions, one is left to consider the commercial context of the agreement.   The basic legal backdrop against which the plan was written was the Bankruptcy Code's priority scheme.   In that scheme, allowed secured claims are entitled to be paid in full.   In a cram down scenario where a debtor is reorganizing and intends to retain a secured creditor's collateral, allowed secured claims need not be paid in full on the effective date – they can essentially be repaid over time.[35]   There is no suggestion, however, that in the circumstances presented here there would have been a legal basis to subordinate an allowed secured claim to the claim of unsecured creditors.   TREW accordingly has a fairly strong argument that this commercial context of the agreement supports the conclusion that the term "Class 3 Claims" when used in § 10.3(a) must be limited to TREW's deficiency claim, rather than extending to TREW's secured claim.

---

[34] *Id.* § 6.4(b)(ii) (emphasis added).

[35] 11 U.S.C. § 1129(b)(2)(A).

Finally, the liquidating trust's reading creates an anomaly that would be avoided by TREW's construction. If § 10.3(a) subordinates the payment of all of TREW's Class 3 Claims to the payment of $350,000 to the holders of claims in Classes 4, 5, and 6, then the happenstance of the *timing* of payments would turn out to affect the parties' substantive entitlements.

All parties agree that the $350,000 subordination and the 60/40 split apply to the proceeds of "Retained Causes of Action." And if those proceeds (in an amount that exceeded $350,000) were brought in *one day before* the estate received the refund of the unearned insurance premium, then the full unearned insurance premium would be paid to TREW. But under the liquidating trust's reading of § 10.3(a), the substantive result is very different if the unearned insurance premium comes in *one day before* the proceeds of the Retained Cause of Action. In that case, the first $350,00 of the insurance premium refund is paid, by virtue of the subordination provision, to the holders of claims in Classes 4, 5, and 6. Only the amount in excess of $350,000 would be paid to TREW. Moreover, the proceeds of the Retained Causes of Action would thereafter be subject to the 60/40 split.

To make this concrete, consider a hypothetical in which, on Day 1, the liquidating trust received $500,000 on a retained cause of action. And on Day 2, the liquidating trust received a refund of an $800,000 unearned insurance premium. On *both parties'* reading of the plan, the first $350,000 received on the retained cause of action would be paid to Class 4, 5, and 6 holders, with the $150,000 balance being subject to the 60/40 split (such that TREW would receive $60,000). TREW

21

would then receive the full $800,000 refund, such that it would receive a total distribution of $860,000.

But now consider if the order of payments were reversed.  In that event, on the liquidating trust's reading, TREW would receive $450,000 of the insurance premium payment, after the first $350,000 was paid to the Class 4, 5, and 6 holders. Then, the $500,000 receipt on a retained cause of action would be subject to the 60/40 split (such that TREW would receive $200,000).  In this scenario, TREW's total recovery would be $650,000 – which is $210,000 less than it would receive had the order of payments been flipped.  That anomaly, however, is avoided if one reads § 10.3(a) as TREW urges, concluding that the reference in that section to "Class 3 Claims" is actually to TREW's deficiency claim.

The Court is ultimately persuaded by these contextual clues that TREW's reading of the plan on this point is the more persuasive one.  The Court accordingly will deny the liquidating trust's request that the Court "clarify" that TREW's rights to receive the proceeds of the unearned insurance premium refund be subordinated to the recovery of $350,000 by the holders of claims in Classes 4, 5, and 6.

## II.    The $120,000 in cash is TREW's cash collateral that should be returned to TREW.

The parties also dispute whether TREW is entitled to the $120,000 in cash that the debtors held on the effective date of the plan.  As TREW points out, the asset purchase agreements contemplate, in § 2.1(b), that the debtors would sweep the cash in the various accounts on the closing date of the sale.  That cash would be

used to fund the balance the bankruptcy case until the plan became effective, with the balance of that cash returned to the DIP lender.[36]

Here, the parties agree that they negotiated a DIP budget that was intended to be sufficient to fund the costs associated with the bankruptcy case from the closing of the sales until the plan became effective. That budget describes the debtors' use of the cash to fund the rest of the bankruptcy case as the use of "cash collateral." On that basis, TREW contends that it is entitled to have the $120,000 of unused cash returned to it.

The liquidating trustee, however, argues that after the closing of the sale, the debtors could not have held any of TREW's cash collateral because the credit bid satisfied TREW's DIP loan in full. Accordingly, when it turned out that upon the effective date of the plan the debtor turned over to the liquidating trust $120,000 in cash that (as a result of conservative budgeting) had not been spent, the liquidating trustee took the position that the DIP loan was no longer in existence, TREW had no cash collateral, and that the liquidating trust was therefore entitled to the $120,000.

The liquidating trust's position on this point fails both as a matter of the big-picture context of the transactions and as a technical reading of the documents. With respect to the broader picture, the story is complicated by the fact that TREW is wearing many hats, acting as the prepetition lender, asset purchaser, and DIP lender. Had TREW not been the DIP lender, the parties could (and customarily

---

[36] D.I. 311-1 § 2.1(b).

would) have accounted for a variance in the seller's cash position at the time of the closing of a transaction through the mechanic of a post-closing purchase price adjustment.

The issue here is slightly more complicated because, to avoid administrative insolvency, it was incumbent on TREW to finance the case from the closing of the sale until the effective date of the plan. That could have been accomplished more cleanly through a supplemental DIP loan to cover the remaining period. Alternatively, the parties could have provided a description of the acquired cash in the asset purchase agreement that excluded the cash actually used to fund the rest of the case. Instead of either of those alternatives, the mechanic chosen was to treat the balance as "cash collateral," on the assumption and understanding that any excess collateral would be returned to the lender. While the Court is loath to recast the parties' agreements, the Court believes that the intent of the parties is more than clear enough that TREW was financing the remainder of the bankruptcy case – not making a gift to the debtors' unsecured creditors. The liquidating trustee's argument in this regard is a technical "gotcha" point that cannot be squared with the economic substance of the parties' transaction.

Moreover, even as a technical matter, the liquidating trust is incorrect in suggesting that the credit bid operated to eliminate the DIP loan. While it is true that the credit bid included all of the then-outstanding debt under the DIP loan, the DIP loan and order provided for the payment in full of the lender's fees, and TREW has subsequently submitted invoices for fees that were not included in the credit

bid.[37]  Accordingly, even treating the $120,000 as "cash collateral," TREW remains

entitled to recover against this collateral that secures its remaining DIP obligations.

The liquidating trust's motion for a clarification on this point will thus be denied.

### Conclusion

For the reasons described above, the liquidating trust's motion will be

granted in part and denied in part.  The parties are directed to settle an appropriate

form of order reflecting this ruling.


Dated: October 2, 2025                     _____
                                           CRAIG T. GOLDBLATT
                                           UNITED STATES BANKRUPTCY JUDGE

---

[37] The order approving the DIP loan, however, directs the debtors to pay all fees and expenses "in connection with the DIP Facility."  That language, by its terms, survives the satisfaction of the other obligations under the DIP loan.  *See* D.I. 190 ¶¶ 25, 45, 48.