# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

CRAIG T. GOLDBLATT  
JUDGE

824 N. MARKET STREET  
WILMINGTON, DELAWARE  
(302) 252-3832



November 10, 2025

**VIA CM/ECF**

Re:    *In re BurgerFi International, Inc., et al.*, No. 24-12017

Dear Counsel:

In early October, this Court issued a decision that resolved a dispute between the liquidating trust and TREW over the meaning of the plan.[1] TREW was both the debtors' secured creditor and the buyer of the debtors' assets in a sale approved under § 363. As the parties told the story to this Court, the debtors had been expecting a rebate for unearned insurance premiums. At the time the plan was drafted, the expectation was that the funds would arrive before the plan became effective. As the motion explained the circumstances, those funds had not yet been received by the effective date but were expected shortly.

Everyone agrees that if those funds had come in before the plan's effective date, the cash would have gone (like all of the debtors' cash, save for the $250,000 that TREW agreed to leave behind to fund the liquidating trust's operating expenses) to

---

[1] TREW Capital Management Private Credit 2, LLC is referred to as "TREW."

TREW. But because it did not, ownership of those assets shifted from the debtors to the trust, meaning that the refund became a "Liquidating Trust Asset" as that term was defined in the plan. As such, this Court concluded that TREW's right to receive those proceeds was subordinated to the trust's administrative expenses. The reason for this was a sentence in § 9.1(f)(i) of the plan, that says so, quite plainly. "For the avoidance of doubt, the Liquidating Trust shall pay or reserve for all Liquidating Trust Expenses before a Distribution may be made from Liquidating Trust Assets."[2]

TREW made two arguments to the contrary, neither of which the Court found persuasive. The *first* was that these proceeds were purchased assets under the asset purchase agreement, and therefore belonged to it, not to the liquidating trust. The Court rejected that argument, however, because the asset purchase agreement's definition of "excluded assets" spoke specifically and directly to these funds: "unearned or refunded insurance policy premiums" are "excluded assets."[3]

TREW's *second* argument was that even if the insurance proceeds were "excluded assets," as proceeds of TREW's collateral, those proceeds should still be paid to TREW under § 6.4(b)(i) of the plan. And that section provides that "[i]f recovered by the Debtors or the Liquidating Trust … all refunds or returns of

---

[2] D.I. 1348-1 § 9.1(f)(i).

[3] D.I. 311-1 § 2.2. *See also* D.I. 1953 (Memorandum Opinion) at 14.

unearned insurance policies that have been canceled, rejected or terminated by the Debtors, shall be paid to TREW."[4]

So there is no question that if all of the trust's expenses were reserved or paid, these proceeds would be paid to TREW.[5] But if the funds did not come in until after the plan's effective date, they would become "Liquidating Trust Assets" under the plan. That is what happened. Accordingly, TREW's right to those funds under § 6.4(b)(i) remained subject to the requirement of § 9.1(f) that nothing would be paid out of Liquidating Trust Assets until the trust's costs were covered.

TREW has sought reconsideration.[6] Its motion makes two points. *First*, it attaches declarations stating that the Court was operating under a factual misapprehension. The funds in question were not a receivable that the parties were still expecting to arrive. Rather, the insurance broker had paid these funds to TREW, which in turn used the proceeds to pay its obligations in connection with the transaction.[7]

That fact provides no basis for reconsideration. While there are circumstances in which "new facts" may provide a basis for reconsideration, the facts need to be ones that were not known or knowable to the parties at the time the matter was first

---

[4] D.I. 1348-1 § 6.4(b)(i)(2).

[5] The Court rejected the liquidating trust's argument that these amounts should be further subordinated to the payment of $350,000 to unsecured creditors. *See* D.I. 1953 at 16-22.

[6] D.I. 1964.

[7] D.I. 1964-2 at 6.

presented to the Court. TREW obviously knew that it had the money at the time the motion was briefed, but for whatever reason did not include that fact in its briefing to the Court. There is no theory of "reconsideration" under which a party can tell a court part of the factual story and then get another bite at the apple on the ground that it chose to hold back something that might have been relevant.[8]

But even in a world in which such a thing were permitted, it would not help TREW. The Court's decision was based on its reading of the relevant documents. It appears, based on the new declarations, that both TREW and the insurance broker apparently read the documents differently. But in the absence of pointing to any actual language in the relevant documents that would support such a reading, the fact that one of the parties (with an obvious self-interest) and an insurance broker came to a different conclusion would not move the needle on how the Court construes either the asset purchase agreement or the confirmed plan. The Court's reasoning in that regard is set out in full in its original Memorandum Opinion. The new declarations do not affect that analysis.

TREW's *second* argument is that on the merits, the Court's decision is simply incorrect. TREW argues that, contrary to the Court's reading, the language of § 6.4(b)(i) is *not* subject to the requirement of § 9.1(f). The only point TREW makes

---

[8] *See Intermec Technologies Corp. v. Palm, Inc.*, 830 F. Supp. 2d 1, 4 (D. Del. 2011) ("Motions for reargument or reconsideration may not be used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided.") (internal quotation omitted).

in this regard that was not addressed in the Court's Memorandum Opinion is the fact that § 8.1(a) of the plan provides that Liquidating Trust Assets "shall automatically vest in the Liquidating Trust free and clear of all Claims, Liens, and Interests *other than the TREW Interests*."[9]  The fact that the insurance refunds, even had they been paid to the trust, would have remained subject to TREW's liens is perhaps the strongest argument for TREW's reading.  TREW's claim is that it is counterintuitive for the provision of the plan stating that "the Liquidating Trust shall pay or reserve for all Liquidating Trust Expenses before a Distribution may be made from Liquidating Trust Assets" to apply to assets that are owned by the trust but are still subject to TREW's lien.

But even so, the Court finds that the language of § 8.1(a) is insufficient to overcome the clarity of § 9.1(f)(i).  In the face of language as clear and straightforward as the command in § 9.1(f)(i), had the parties intended to create an exception for assets that were the proceeds of TREW's collateral, it was incumbent on them to include language so providing.  That would have been easy enough to accomplish through the addition of a few words: "For the avoidance of doubt, the Liquidating Trust shall pay or reserve for all Liquidating Trust Expenses before a Distribution

---

[9] D.I. 1348-1 § 8.1(a) (emphasis added).  TREW mentioned this provision in passing in its opposition to the Trust's motion to clarify.  *See* D.I. 1931 at 18-19.  While the point was not particularly developed in the brief, the Court concludes that TREW's brief did fairly present the issue to the Court.

may be made from Liquidating Trust Assets **other than those assets that are TREW's collateral or the proceeds thereof**."

Section 8.1(a) is insufficient to do that work. While the section states that the assets remain subject to TREW's lien, that *does not* mean that the assets are not Liquidating Trust Assets. The holding in the Supreme Court's decision in *Whiting Pools*, after all, is that when a secured creditor (there, the Internal Revenue Service) has repossessed an asset before the petition date, the asset is still "property of the estate" under § 541 and thus subject to the turnover obligation of § 542 of the Bankruptcy Code.[10] The Court thus rejected the government's bundle-of-sticks argument that the IRS's security interest was a separate item of property that was outside of the bankruptcy estate. "Although Congress might have safeguarded the interests of secured creditors outright by excluding from the estate any property subject to a secured interest, it chose instead to include such property in the estate…"[11] Secured creditors are thus entitled to the protections, but subject to the requirements, imposed by the Bankruptcy Code.[12]

Under that same reasoning, the fact that, under § 8.1(a) the Liquidating Trust Assets remain subject to TREW's lien (rather than being "free and clear") does not change the fact that they nevertheless are Liquidating Trust Assets. TREW is thus

---

[10] *United States v. Whiting Pools*, 462 U.S. 198 (1983).

[11] *Id.* at 203-204.

[12] *Id.*

entitled to the protections, but subject to the requirements, imposed by the plan. To that end, § 9.1(f) is unambiguous that all creditors' rights to recover out of such assets are subordinated to the expenses of the trust.

TREW argues vociferously about its commercial expectations, and secured creditors' rights to realize the value of their collateral. But nothing in ordinary commercial norms provides an answer to the question of how to construe these plan terms. It is certainly the case that secured creditors generally expect to recover, in bankruptcy, the value of their collateral. But as the Memorandum Opinion explains, that expectation must be tempered by the fact that when the debtor has no material unencumbered assets, the secured creditor cannot maximize the value of its collateral on the backs of administrative creditors and is generally required to carve out of its collateral sufficient value to fund the bankruptcy process. TREW's argument is that it agreed to fund the post-confirmation trust with $250,000 of its collateral and nothing further. But there would be nothing commercially irrational about an agreement to fund the trust with $250,000 *plus* any further amounts that come into the trust post-petition to the extent necessary to cover the trust's expenses. Pointing to commercial norms does nothing to help choose between the two potential readings of the plan, both of which are commercially plausible ones. For the reasons described in the Memorandum Opinion and above, the second reading is the better and more natural construction of the language of the plan, and therefore controls.

TREW also makes much of the fact that the liquidation analysis contemplated that TREW would receive the value of the insurance refunds. But that is unsurprising. As the Memorandum Opinion explained, the parties' expectation was that (a) those refunds would have come in before the plan became effective and (b) the $250,000 that TREW agreed to leave behind for the trust would have been sufficient to fund the trust's expenses. Had *either* of those two assumptions been correct, the value of the insurance refunds would have been distributed to TREW. The problem presented by the motion arose only because events actually unfolded in a way that differed from the parties' expectations in *both* of these respects. For the reasons described above, however, the answer to what happens in those circumstances is readily discernible from the language of the applicable documents. It is no answer to that reading to say that the outcome differs from what the parties expected to happen.

Finally, the Court notes that had the trust been aware that the funds had been distributed to TREW before it filed the motion to clarify, a case could be made that the relief it would have been seeking (the payment of money from TREW) would have required an adversary proceeding.[13] There is no question, however, about this Court's personal jurisdiction over TREW. And the procedures employed in this motion provided TREW with a full and fair opportunity to present its arguments on the merits. Because the trust did not know that TREW was in possession of the funds

---

[13] *See* Fed. R. Bankr. P. 7001(a) (describing as "proceeding to recover money or property" as a matter that should proceed by adversary proceeding).

when it filed the motion (and TREW never said otherwise until it filed its motion for rehearing), the Court does not believe it would make any sense to elevate form over substance and – at this late stage – require that the matter proceed by way of adversary proceeding.[14]  In order to protect TREW's rights, however, this Court added language to the order it entered disposing of the motion, providing that Bankruptcy Rule 7062 would apply to this contested matter.[15]  The point of that language is that because the order effectively operates as a money judgment, TREW should be entitled to obtain a stay of the enforcement of that judgment by posting a supersedeas bond under Rule 7062 in the same way that it would have been able to had this matter proceeded as an adversary proceeding.

For the foregoing reasons, TREW's motion for reconsideration will be denied. The Court will enter a separate order so providing.

Sincerely,

Craig T. Goldblatt
United States Bankruptcy Judge

---

[14] *See also* Fed. R. Bankr. P. 9005 (errors that do not "affect a substantial right" are to be disregarded).

[15] D.I. 1976 ¶ 8.